EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Iván Díaz Carrasquillo<br>    Peticionario<br><br>v.<br><br>Hon. Alejandro García Padilla<br>    Recurrido | 2014 TSPR 75<br><br>191 DPR ____ |

Número del Caso: CT-2013-18


Fecha: 19 de junio de 2014


Oficina de la Procuradora General:

        Lcda. Margarita Mercado Echegaray
        Procuradora General

        Lcda. Mónica Cordero Vázquez
        Procuradora General Auxiliar



Abogado de la Parte Recurrida:

        Lcdo. Jean Philip Gauthier-Iñesta



Materia: Certificación Interjurisdiccional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Iván Díaz Carrasquillo<br><br>        Peticionario<br><br>          v.<br><br>Hon. Alejandro García Padilla<br><br>        Recurrido | CT-2013-0018 | *Certificación*<br><br>*Interjurisdiccional* |

Opinión del Tribunal emitida por la Jueza Asociada señora Pabón Charneco.

En San Juan, Puerto Rico, a 19 de junio de 2014.

I

Como máximos intérpretes del derecho estatal, hoy atendemos un recurso de Certificación Interjurisdiccional solicitado por el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico ("Tribunal de Distrito"). En este, determinamos el poder del Gobernador de Puerto Rico para destituir a un funcionario al cual le fue delegado un híbrido de funciones ejecutivas, cuasi-legislativas y cuasi-judiciales. Particularmente, debemos determinar si el Procurador de las Personas con Impedimentos es un funcionario de libre remoción o solo puede ser destituido por alguna de las causas establecidas en la ley. Concluimos que tiene un interés propietario

durante la duración de su nombramiento. Por lo tanto, no es un funcionario de libre remoción y solo podrá ser removido por las causas de destitución establecidas por ley.

Por otra parte, determinamos que la Doctrina de Inmunidad Legislativa no limita el derecho propietario del cual es acreedor este funcionario. Su destitución no está cobijada por la inmunidad legislativa, pues no es una actividad legislativa legítima, sino un acto de naturaleza administrativa. Por otro lado, reiteramos que cuando la Asamblea Legislativa deroga un cargo y crea otro con nombre diferente, pero preservando los deberes y obligaciones del primero, el funcionario que lo ostentaba no pierde el interés propietario sobre dicho cargo.

## II

El Sr. Iván Díaz Carrasquillo (en adelante "señor Díaz Carrasquillo" o "Procurador"), juramentó como Procurador de la Oficina de las Personas con Impedimentos el 15 de noviembre de 2011. El nombramiento fue por un término de diez (10) años, según dispuesto en el Plan de Reorganización Núm. 1-2011, conocido como el Plan de Reorganización de las Procuradurías, 3 LPRA Ap. XVII. Cónsono con ello, el término del nombramiento del señor Díaz Carrasquillo se extendía hasta noviembre de 2021.

No obstante, el 24 de julio de 2013, bajo la administración del entonces recién electo Gobernador de Puerto Rico, Hon. Alejandro García Padilla (en adelante

"Gobernador"), se aprobó la Ley Núm. 75-2013, con el único objetivo de derogar el Plan Núm. 1-2011, *supra*. En la misma fecha, se aprobó la Ley Núm. 78-2013, mediante la cual se creó la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico. Posteriormente, en agosto de 2013, el señor Díaz Carrasquillo fue destituido de su cargo sin celebrarse una vista previa.

A raíz de estos eventos, el Procurador presentó una Demanda en el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico (Tribunal de Distrito), en la cual alegó que se le habían violado los derechos consagrados en la Primera, Quinta y Decimocuarta Enmienda de la Constitución de los Estados Unidos. En particular, alegó que había sido discriminado y hostigado por su afiliación política, lo que le impidió desempeñar sus funciones. Adujo además, que se creó un ambiente hostil para forzarlo a que abandonara su trabajo. También arguyó que se le violaron sus derechos constitucionales al ser despedido sin un debido proceso de ley a pesar de tener un interés propietario sobre su empleo. Finalmente, solicitó un remedio interdictal para evitar que continuaran discriminándolo y daños bajo el Art. 1802 del Código Civil de Puerto Rico, 31 LPRA sec. 5141.

Luego de realizar dos (2) vistas, los días 4 y 24 de septiembre de 2013, y revisar los alegatos presentados por las partes, el Tribunal de Distrito destacó que el

Gobernador no había alegado tener causa para destituir al Procurador ni que este hubiese sido negligente en el desempeño de sus funciones.[1] Asimismo, determinó que el Procurador realizaba funciones ejecutivas, así como cuasi-judiciales y algunas cuasi-legislativas. En cuanto a las funciones ejecutivas, el Tribunal de Distrito destacó que el Procurador estaba encargado de seleccionar personal, desarrollar programas de asistencia para las personas con impedimentos, al igual que coordinar servicios con agencias locales y federales. También estaba encargado de desarrollar un presupuesto anual, supervisar a los oficiales examinadores y representar a dicha población en los procedimientos que estén dentro de su jurisdicción, entre otras funciones relacionadas.[2]

Respecto a las funciones cuasi-judiciales, el Tribunal de Distrito resaltó que el Procurador estaba encargado de investigar las Querellas presentadas por las personas con impedimentos, relacionadas a posibles violaciones a sus derechos por parte de agencias o entidades municipales o privadas. De igual forma, tenía la función de celebrar vistas, transar y adjudicar controversias. Asimismo, entre sus funciones estaba inspeccionar los expedientes de las agencias a las cuales investigaba, tomar juramentos e imponer multas, entre otras actividades relacionadas.[3] En lo concerniente a sus

---

[1] *Véase Amended Opinion and Order*, pág. 2 n.1.
[2] *Íd.*, págs. 4-5.
[3] *Íd.*, págs. 5-6.

funciones cuasi-legislativas, el Tribunal de Distrito destacó que el Procurador tenía el deber de asesorar a la Asamblea Legislativa sobre la legislación que considerara necesaria para desarrollar política pública consistente con los derechos constitucionales de las personas con impedimentos, al igual que adoptar los reglamentos necesarios para implantar los programas creados de acuerdo al Plan Núm. 1-2011, *supra.*[4]

En vista de lo anterior, el Tribunal de Distrito concluyó que el Procurador realizaba un híbrido de funciones ejecutivas, cuasi-judiciales y cuasi-legislativas. En consideración a que nuestro Tribunal no se ha expresado sobre cuál es la clasificación que se le debe otorgar a este tipo de funcionario, el Tribunal de Distrito concedió un interdicto preliminar para evitar la destitución del Procurador hasta tanto nos expresáramos sobre el particular y mediante el recurso de certificación interjurisdiccional nos consultó las siguientes controversias de derecho exclusivo estatal:

> (1) Si el Procurador para las Personas con Impedimentos de Puerto Rico, por sus funciones, disfruta de un derecho limitado de propiedad para permanecer en su puesto por la duración del término fijo sujeto a "justa causa" según definido en ley.
>
> (2) Si la restricción de "justa causa" impuesta al Gobernador para remover al peticionario de su posición debe considerarse como una interferencia a su capacidad para realizar sus deberes constitucionales y ejecutar propiamente sus obligaciones.

---

[4] *Íd.,* págs. 6-7.

(3) ¿Qué factores debe la Corte considerar al realizar esa determinación?

(4) De existir un derecho de propiedad limitado bajo la ley de Puerto Rico, si el demandante perdería dicho derecho bajo la doctrina de inmunidad legislativa levantada por los demandados.

Luego de haber expedido el recurso de certificación, procedemos a contestar las preguntas certificadas.

III

**A. Origen y evolución de la Oficina del Procurador de las Personas con Impedimentos**

Mediante la Ley Núm. 2 de 27 de septiembre de 1985 (Ley Núm. 2-1985), 3 LPRA ant. sec. 532 *et seq.*,[5] la Asamblea Legislativa de Puerto Rico creó la Oficina del Procurador de las Personas con Impedimentos (OPPI). Según se desprendía del Art. 3 de esta ley, 3 LPRA ant. sec. 532b, el propósito de la OPPI era:

> servir como instrumento de coordinación para atender y viabilizar la solución de los problemas, necesidades y reclamos de las personas con impedimentos en las áreas de la educación, la salud, el empleo, y la libre iniciativa empresarial o comercial, de los derechos civiles y políticos, de la legislación social, laboral y contributiva, de la vivienda, la transportación, la recreación y la cultura, entre otras. Asimismo, tendrá la responsabilidad de establecer y llevar a cabo un programa de asistencia, orientación y asesoramiento para la protección de las personas con impedimentos.

La legislación establecía que entre las funciones y responsabilidades de la OPPI estaba llevar a cabo programas de asesoría, orientación y servicios para las personas con impedimentos. 3 LPRA ant. sec. 532e.

---

[5] Esta ley fue derogada mediante el Plan de Reorganización Núm. 1-2011, *supra,* el cual a su vez fue derogado por la Ley Núm. 75-2013.

Asimismo, serviría como mediadora con las agencias públicas y privadas que le ofrecían servicios a esta población. Entre sus funciones también se encontraba fomentar la integración de las personas con impedimentos en diversas áreas de la comunidad. Además, uno de los deberes de la OPPI era mantener actualizadas las estadísticas sobre esta población, crear un catálogo sobre los programas dirigidos a ofrecerles servicios a las personas con impedimentos y velar porque estas no fueran discriminadas. Cónsono con esto, entre sus funciones estaba orientar a esta población sobre sus derechos, establecer un programa mediante el cual pudiesen canalizar sus reclamos sobre la inacción de las agencias públicas, además de desarrollar nuevos métodos para que las personas con impedimentos pudieran desarrollarse al máximo. *Íd.*

Estas funciones se mantuvieron inalteradas por diecisiete (17) años. No es hasta el 2002, que la Asamblea Legislativa vuelve a expresarse sobre el particular y enmienda el anterior Art. 3 de la Ley Núm. 2-1985, *supra,* para establecer que la OPPI debía ser una "entidad jurídica independiente y separada de cualquier otra agencia o entidad pública". Ley Núm. 9-2002, 3 LPRA ant. sec. 532b. Según se desprende de la Exposición de Motivos de la anterior Ley Núm. 9-2002, *supra*, la OPPI se independizó para que ejerciera sus funciones fiscalizadoras de una manera más efectiva.

Asimismo, mediante la Ley Núm. 9-2002, *supra,* el legislador expresó una preocupación porque la posición del Procurador estuviese expuesta a los vaivenes políticos cada cuatro (4) años y enmendó la anterior Ley Núm. 2-1985, *supra*, para disponer que el Procurador sería nombrado con el consejo y consentimiento del Senado de Puerto Rico por un término de diez (10) años, 23 LPRA ant. sec. 532b-1. Asimismo, se dispuso que previa notificación y vista, el gobernador tenía la prerrogativa de declarar vacante el puesto cuando el procurador designado fuera negligente en el desempeño de sus funciones. Al respecto, estableció como causas de destitución "los delitos contra la función pública, delitos contra el erario público y delitos graves, o cualquier delito menos grave que conlleve depravación moral". *Íd.*

Empero, con las enmiendas del 2002 el legislador no derogó o modificó las facultades que le habían sido concedidas al Procurador mediante la anterior Ley Núm. 2-1985, *supra*. Específicamente, al Procurador se le había delegado la función de mantener la organización interna de la OPPI, al igual que llevar a cabo todas las acciones administrativas y gerenciales necesarias para poder cumplir con los objetivos de la ley. 3 LPRA ant. sec. 532f. Asimismo, se le delegó la facultad de nombrar al personal necesario para cumplir con los propósitos de la ley, administrar el presupuesto de la OPPI y concertar los acuerdos con el Gobierno de Puerto Rico y Estados Unidos a

los fines de proteger los derechos de las personas con impedimentos. *Íd.* Anualmente, el Procurador debía rendir un Informe al Gobernador y a la Asamblea Legislativa de Puerto Rico en el que debía incluir sus logros, los programas desarrollados, asuntos y querellas atendidas, al igual que un análisis del manejo de los fondos asignados durante ese año.

Así las cosas, las facultades y deberes del Procurador se mantuvieron inalterados por veintiséis (26) años. No es hasta la aprobación del Plan de Reorganización Núm. 1-2011, conocido como el Plan de Reorganización de las Procuradurías, que se incluyeron algunas modificaciones. De primera instancia, al revisar la política pública del Plan Núm. 1-2011, *supra*, parecería que la anterior Ley Núm. 2-1985, *supra*, sufrió cambios significativos. Sin embargo, luego de analizar la legislación con detenimiento y profundidad nos percatamos de que esto no ocurrió. Con la aprobación de este plan se creó la Oficina de Administración de Procuradurías (OAP), bajo la cual se consolidaron las facultades, funciones y deberes de la Oficina del Procurador de la Salud, la Oficina del Procurador de las Personas Pensionadas y de la Tercera Edad, la Oficina del Procurador de los Veteranos y la Oficina del Procurador de las Personas con Impedimentos. La creación de esta Oficina buscaba integrar los servicios ofrecidos por todas las procuradurías, mientras que se mantenía la independencia

de criterio de cada procurador. Es decir, la OAP tenía como propósito hacerse cargo de las funciones administrativas de las agencias, para que cada Procurador dirigiera todos sus esfuerzos a velar por la población representada por cada uno. 3 LPRA ant. Ap. XVII. Las funciones administrativas que eran realizadas por los procuradores fueron delegadas a un Administrador que sería nombrado por el Gobernador con el consejo y consentimiento del Senado por un término de cinco (5) años, esto con el propósito de maximizar los servicios ofrecidos a los ciudadanos. *Íd.* En síntesis, el legislador dispuso lo siguiente:

> Es política pública de esta Administración fortalecer y ampliar las facultades, funciones y deberes de los Procuradores de fiscalizar, educar, coordinar servicios y abogar por los derechos de las poblaciones que representan, enfatizando a su vez las responsabilidades que tienen las agencias y entidades correspondientes con las diversas poblaciones aquí mencionadas de brindarles servicios directos de calidad, justo y con el respeto que éstos ameritan. *Íd.*

A tenor con esta política pública, el legislador mantuvo las facultades y deberes que le habían sido otorgadas al Procurador de las Personas con Impedimentos en la anterior Ley Núm. 2-1985, *supra.* No obstante, añadió que el Procurador debía asesorar al Gobernador y a la Asamblea Legislativa sobre la legislación pertinente para implantar la política pública dispuesta en el Plan. Asimismo, debía asesorar a las agencias y entidades privadas con el propósito de mejorar los servicios

prestados y debía remitir una petición de presupuesto anual a la Oficina de Gerencia y Presupuesto. *Íd.* Ciertamente, hay diferencia en cuanto a las disposiciones relativas a las funciones de administración y operación internas de la OAP. No obstante, las funciones cuasi-legislativas y cuasi-judiciales del Procurador se mantuvieron inalteradas. Consecuentemente, no hay duda de que las facultades y deberes delegados al Procurador no sufrieron cambios significativos desde la creación de la OPPI en el 1985.

Dos (2) años después, el 24 de julio de 2013, la Ley Núm. 75-2013, *supra*, derogó el Plan de Reorganización de las Procuradurías, *supra*. Esto porque los legisladores entendieron que el mismo solo había causado la pérdida de fondos federales y no había cumplido con el objetivo de que los servicios brindados a los ciudadanos fueran más eficientes. En esencia, el legislador justificó la derogación del Plan porque las Oficinas no habían sido evaluadas conforme al Consejo de Modernización de la Rama Ejecutiva, creado por virtud de la reorganización para, entre otras cosas, evaluar el funcionamiento de los departamentos ejecutivos. *Véase* Ley Núm. 182-2009, 3 LPRA sec. 8821 *et seq.*

Ahora bien, el mismo día en que se derogó el Plan de Reorganización de las Procuradurías, *supra*, la Asamblea Legislativa aprobó la Ley Núm. 78-2013, conocida como la

Ley del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico, mediante la cual creó la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico. Esta ley incorporó el lenguaje que se había utilizado para enmendar el Art. 3 de la Ley Núm. 2-1985, *supra*. El Art. 4 de la nueva ley estableció lo siguiente:

> Se crea. . . como una entidad jurídica independiente y separada de cualquier otra agencia, la cual tendrá, entre otras funciones dispuestas en esta Ley, la responsabilidad de servir como instrumento de coordinación para entender y solucionar los problemas, las necesidades y reclamos de las personas con impedimentos.

Además de retomar la idea de la OPPI como una entidad jurídica independiente, esta ley también sostuvo que el Procurador iba a ser nombrado por el Gobernador con el consejo y consentimiento del Senado por un término de diez (10) años. Asimismo, se incluyó el Consejo Consultivo previsto desde 1985 para asesorar al Procurador y más importante aún, se incluyeron *ad verbatim* las facultades y responsabilidades que le habían sido otorgadas a la OPPI mediante la Ley Núm. 2-1985, *supra.* Lo mismo sucedió con las facultades y deberes del Procurador, debido a que se mantuvieron inalterados.

Como podemos observar, desde su creación en 1985, la OPPI ha experimentado cambios administrativos, pero no así en su denominación de entidad jurídica independiente que tiene como propósito principal maximizar y fiscalizar los

servicios que les son otorgados a las personas con impedimentos. Sin reparos, podemos concluir que continuamente los legisladores han estado preocupados por los servicios que se le otorgan a las personas con impedimentos y han sido consistentes en mantener una agencia con cierta independencia del Ejecutivo, la cual está encargada de viabilizar los reclamos contra las entidades públicas y privadas garantizando así que a estas personas no se les violen los derechos consagrados en la Constitución de Puerto Rico. Art. II, Sec. I, Const. E.L.A., LPRA Tomo 1, ed. 2008, pág. 272.

### B. Doctrina de Separación de Poderes

Nuestro sistema republicano de gobierno está sustentado en la separación de poderes entre las tres (3) ramas de gobierno: la Ejecutiva, la Legislativa y la Judicial. Art. I, Sec. 2, Const. E.L.A., LPRA Tomo 1, ed. 2008, pág. 271. Al respecto hemos expresado que más que a una regla técnica de derecho, la Doctrina de Separación de Poderes está invariablemente atada a nuestra comunidad política. *AAR, Ex parte,* 187 DPR 835, 855 (2013). Esto porque la finalidad de esta doctrina es mantener la colaboración entre las tres (3) ramas de gobierno, sin que una domine o interfiera indebidamente con la otra. *Colón Cortés v. Pesquera,* 150 DPR 724, 750 (2000). El propósito ulterior es proteger la libertad de los ciudadanos y

garantizar la independencia de cada una de las ramas de gobierno. *Íd.*

En síntesis, no se pretende eliminar la interacción entre las ramas, sino que mediante un sistema de pesos y contrapesos las actuaciones de una rama no sean detrimentales para la otra. "[S]ignifica que la función judicial sólo puede ser llevada a cabo por la Rama Judicial, y de la misma manera, que labores no judiciales deben ser dejadas para la correspondiente actuación de las otras ramas". *Íd.*, pág. 752 (Énfasis omitido).

## C. Debido proceso de ley

El Art. II, Sec. 7 de nuestra Constitución establece que ninguna persona será privada de su libertad o propiedad sin un debido proceso de ley. Const. E.L.A., *supra*, pág. 296. *Véanse además* Emdas. V & XIV, Const. EE.UU., LPRA Tomo 1. Como es sabido, esta protección se manifiesta tanto en su vertiente sustantiva como procesal. En la primera se examina la validez de una ley al amparo de la Constitución, mientras que en la vertiente procesal se consideran las garantías mínimas que el Estado debe resguardarle a un individuo al afectarle su vida, propiedad o libertad. *Picorelli López v. Depto. de Hacienda,* 179 DPR 720, 735-736 (2010); *Domínguez Castro v. E.L.A.,* 178 DPR 1, 46 (2010); *Hernández v. Secretario,* 164 DPR 390, 394-395 (2005); *Rivera Santiago v. Srio. de Hacienda*, 119 DPR 265, 273 (1987).

A tenor con estas disposiciones, lógicamente hemos reconocido que el debido proceso de ley en su vertiente procesal solamente puede ser invocado cuando el Estado atenta contra el interés individual de libertad o propietario de una persona. *González Segarra et al. v. CFSE,* 188 DPR 252, 278 (2013); *Calderón Otero v. C.F.S.E.,* 181 DPR 386, 398 (2011). Por consiguiente, de existir este interés, entonces procede que el Estado otorgue las siguientes garantías: "(1) notificación adecuada del proceso; (2) proceso ante un juez imparcial; (3) oportunidad de ser oído; (4) derecho a contrainterrogar a los testigos y examinar la evidencia presentada en su contra; (5) tener asistencia de abogado, y (6) que la decisión se base en el expediente". *González Segarra et al. v. CFSE, supra,* pág. 279 (citando a *Vázquez González v. Mun. de San Juan,* 178 DPR 636 (2010)). En fin, lo primordial es asegurar que las actuaciones del Estado sean justas e imparciales. *E.L.A. et al. v. Molina Figueroa,* 186 DPR 461, 471 (2012); *Rivera Rodríguez & Co. v. Lee Stowell, etc.,* 133 DPR 881, 887-888 (1993).

Cónsono con estas garantías, hemos dispuesto que "un empleado en el servicio público tiene un reconocido interés en la retención de su empleo, si dicho interés está protegido por ley o cuando las circunstancias crean una expectativa de continuidad. Es la presencia de estos factores lo que determina la existencia de un interés propietario". *Domínguez Castro et al. v. E.L.A., supra,*

pág. 69; *Díaz Martínez v. Policía de P.R.,* 134 DPR 144, 148 (1993) (citando a *Orta v. Padilla Ayala,* 131 DPR 227, 241 (1992)); *Morales Narváez v. Gobernador,* 112 DPR 761, 767 (1982); *Pierson Muller I. v. Feijoó*, 106 DPR 838, 852 (1978); *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Asimismo, hemos establecido que cuando un empleado ha sido nombrado por un periodo de tiempo determinado, este es acreedor de una legítima expectativa de retención durante este tiempo. *S.L.G. Giovanetti v. E.L.A.,* 161 DPR 492, 510 (2004)*; Depto. Recs. Naturales v. Correa,* 118 DPR 689, 697 (1987).

En estos casos, es necesario que el empleado sea acreedor de una vista informal donde se le provea la oportunidad de ser escuchado y se le resguarden las garantías antes descritas. *González Segarra v. CFSE, supra; Torres Solano v. P.R.T.C.,* 127 DPR 499 (1990). Es decir, mientras un empleado tiene un interés propietario sobre su empleo, no puede ser removido de este sin que se demuestre justa causa.

### D. Poder de destitución del Primer Ejecutivo

El Poder Ejecutivo de nuestro gobierno está concentrado en el Gobernador de Puerto Rico. Const. E.L.A., *supra*, pág. 402. Para poder descargar sus funciones, en la Constitución se dispuso que este será asistido por los secretarios de gobierno, los cuales

deberán ser nombrados con el consejo y consentimiento del Senado. Const. E.L.A., *supra*, pág. 408.

A tenor con estas disposiciones, se le concedió la facultad expresa para "[n]ombrar, en la forma que se disponga por esta Constitución o por ley, a todos los funcionarios para cuyo nombramiento esté facultado". Const. E.L.A., *supra*, pág. 403. Empero, la Constitución no contiene una disposición expresa sobre la facultad del gobernador para destituir empleados y cuáles, si algunas, deberían ser las limitaciones de la destitución en relación a las funciones realizadas por los empleados gubernamentales. La única disposición relacionada es el Art. III, Sec. 21 sobre los Procesos de Residencia. Const. E.L.A., *supra*, pág. 401.

Ahora bien, al analizar con detenimiento el Diario de Sesiones de la Convención Constituyente de Puerto Rico nos percatamos de la discusión que se suscitó ante la posibilidad de que la Asamblea Legislativa pudiera variar el término de duración del cargo de los secretarios de gobierno, inmiscuyéndose así con la Rama Ejecutiva. 3 Diario de Sesiones de la Convención Constituyente 2268-2271 (1952). Ante la preocupación de que esto no fuera cónsono con el sistema republicano de gobierno que se pretendía perpetuar mediante la Constitución, el delegado señor Gutiérrez Franqui atendió la controversia y propuso que no se debía establecer un término de duración para los cargos de los secretarios de gobierno. Para justificar su

propuesta, el delegado hizo un recuento de cómo el problema había sido atendido en los Estados Unidos.

Luego de exponer la normativa dispuesta en *Myers v. U.S.,* 272 U.S. 52 (1926) y en *Humphrey's Ex'r v. U.S.,* 295 U.S. 602 (1935), la misma fue acogida por el voto de cincuenta y cuatro (54) delegados. Posteriormente, este Tribunal se expresó por primera vez sobre el particular en el año 2005.

En *Guzmán v. Calderón,* 164 DPR 220 (2005), contestamos en la negativa una certificación interjurisdiccional emitida por el Tribunal de Distrito sobre si el requisito de justa causa para la destitución de un integrante de la Junta de Directores de la Corporación de Puerto Rico para la Difusión Pública infringía las facultades constitucionales que le fueron otorgadas al Gobernador. *Íd.,* pág. 224.

Esta pregunta surgió luego de que la entonces Gobernadora, Sila M. Calderón, destituyera al Sr. Arturo Guzmán Vargas por insubordinación y este instara una Demanda alegando que se le habían violado sus derechos civiles. En síntesis, concluimos que este no realizaba funciones puramente ejecutivas, sino que le habían sido delegadas funciones cuasi-legislativas dentro de una agencia con personalidad jurídica independiente, lo que justificaba las restricciones impuestas al poder de destitución del Gobernador. Por consiguiente, el requisito de justa causa requerido para la destitución de este

funcionario no infringía las facultades del Gobernador para descargar sus funciones ejecutivas.

Ese mismo año, el 17 de junio de 2005, este Tribunal nuevamente acogió una certificación del Tribunal de Distrito. *Véase Santana v. Gobernadora,* 165 DPR 28 (2005). En específico, contestamos que al amparo de la Constitución de Puerto Rico, la Gobernadora tenía la facultad para destituir a la Directora Ejecutiva del Consejo de Desarrollo Ocupacional y Recursos Humanos. Concluimos que la Directora Ejecutiva realizaba actividades dirigidas a establecer la política pública del País, por consiguiente, sus funciones eran puramente ejecutivas, lo cual no le otorgaba un interés propietario sobre su empleo. Cónsono con lo anterior, el término de cuatro (4) años impuesto en la ley era uno puramente directivo que no impedía la remoción de la funcionaria pública. *Íd.,* págs. 62-63.

En ambos casos, hicimos referencia a lo dispuesto en *Myers v. U.S., supra*, y en *Humphrey's Executor v. U.S., supra*. No obstante y para ser cónsonos con lo adoptado por los delegados de nuestra Asamblea Constituyente, elaboramos sobre cómo la doctrina había evolucionado en Estados Unidos. Así, destacamos cómo lo dispuesto en *Humphrey's Executor v. U.S., supra*, fue reiterado por el Tribunal Supremo en *Wiener v. United States*, 357 U.S. 348 (1958).

Asimismo, recurrimos a lo establecido posteriormente en *Morrison v. Olson*, 487 U.S. 654 (1988), donde se dispuso que el análisis sobre la facultad de destitución que se tiene sobre un empleado no puede limitarse al tipo de función que este realiza.   A pesar de que esto es esencial para el análisis, es imprescindible evaluar si las restricciones impuestas por la Asamblea Legislativa inciden en la capacidad del Presidente de cumplir y hacer cumplir las leyes.   Es decir, es imperativo que la determinación no violente la separación de poderes que caracteriza nuestro sistema de gobierno.

En síntesis, y reconociendo que hay cierta tensión entre lo resuelto en *Humphrey's Executor v. U.S., supra* y en *Morrison v. Olson, supra*,[6] al momento de evaluar el poder de destitución del primer ejecutivo se tendrá que tener en consideración un híbrido de lo resuelto en ambos casos.   Es decir, en primer lugar se deberá determinar caso a caso la naturaleza de las funciones que realiza el empleado que va a ser destituido de su cargo.   Al determinar si las funciones de un empleado son ejecutivas, cuasi-legislativas o cuasi-judiciales, estamos atendiendo la normativa propuesta en *Humphrey's Executor v. U.S., supra*.[7]

---

[6] W. Vázquez Irizarry, Los poderes del Gobernador de Puerto Rico y el uso de órdenes ejecutivas, 76 Rev. Jur. U.P.R. 951, 1005 (2007).

[7] En *Humphrey's Ex'r v. U.S., supra,* el Tribunal Supremo federal se enfrentó al reclamo de William E. Humphrey (en adelante "Humphrey"), el cual había sido nominado y confirmado por el Senado para presidir el *Federal Trade Commission* (FTC) por un término de siete (7) años. Este nombramiento fue otorgado bajo el mandato del ex Presidente de los Estados Unidos, Herbert Clark Hoover.   No obstante, cuando su

Esto implica que en la única instancia en la que un empleado gubernamental es de libre remoción por el Gobernador es cuando este realiza funciones ejecutivas. Es decir, cuando el empleado incide en la formulación de política pública, lo cual es una función de la Rama Ejecutiva. Empero, en el caso de que un empleado realice funciones primordialmente cuasi-legislativas o cuasi-judiciales, al Gobernador se le podrá requerir que demuestre justa causa para su destitución. De lo contrario, estaríamos permitiendo una violación del principio político de separación de poderes. Así, en estos casos, la Asamblea Legislativa le podrá imponer restricciones al Gobernador para la destitución de estos empleados.

Sin embargo, este análisis por sí solo no es suficiente. Corresponde analizar la totalidad de las circunstancias para determinar, además, si independientemente de las funciones que realiza el funcionario, las restricciones impuestas por la Asamblea

---

predecesor, el presidente Franklin D. Roosevelt asumió el poder, destituyó a Humphrey de su puesto porque entendió que los objetivos de su administración podían ser alcanzados con mayor eficiencia si él seleccionaba el líder de la FTC. Al analizar esta controversia el tribunal reconoció que la comisión era apolítica, de manera que la naturaleza de las funciones realizadas en la FTC exigía imparcialidad. *Íd.*, pág. 624. Asimismo, concluyó además que las funciones del líder de la FTC no eran propiamente ejecutivas, sino predominantemente cuasi-judiciales y cuasi-legislativas. El tribunal entendió que el hecho de que la Asamblea Legislativa le asignara un término mayor al del servicio del presidente fue con el propósito de que la comisión pudiese implementar la ley de una manera justa y efectiva. En síntesis, la intención de los legisladores fue crear una comisión que pudiese ejercer su criterio libre e independientemente, sin estar a merced de la rama ejecutiva.

Legislativa inciden en la facultad del Gobernador de descargar sus funciones ejecutivas.

### E. Doctrina de la Inmunidad Legislativa

La Constitución de Puerto Rico establece que "[l]a Asamblea Legislativa tendrá facultad para crear, consolidar o reorganizar departamentos ejecutivos y definir sus funciones". Const. E.L.A., *supra*, pág. 396. Asimismo, el Art. III, Sec. 14 de nuestra Constitución dispone que: "todo miembro de la Asamblea Legislativa gozará de inmunidad parlamentaria por sus votos y expresiones en una u otra cámara o en cualquiera de sus comisiones". *Íd.*, pág. 392.

Al interpretar esta última disposición constitucional, en *Romero Barceló v. Hernández Agosto,* 115 DPR 368, 379 (1984), especificamos que la protección se extendía a las actividades legislativas legítimas. Es decir, a "los procesos de deliberación, comunicación, investigación, e información y actos necesarios para el desarrollo del proceso legislativo". *Vélez Ramírez v. Colberg Ramírez,* 117 DPR 873, 876 (1986). Lo determinante para otorgar esta protección es la "naturaleza del acto y su relación con el proceso deliberativo y de votación inherente a las funciones parlamentarias". *Silva v. Hernández Agosto,* 118 DPR 45, 60 (1986). *Véase además Acevedo Vilá v. Aponte Hernández,* 168 DPR 443, 455 (2006). Tanto es así, que hemos concluido que la doctrina cobija a

los ayudantes de los legisladores, pues lo importante no es quién lleva a cabo la actividad, sino el acto en sí mismo. *Silva v. Hernández Agosto, supra,* pág. 60. Por otra parte, el Tribunal Supremo federal ha reconocido que la Doctrina de Inmunidad cobija a funcionarios fuera de la Asamblea Legislativa, en tanto estén realizando funciones legislativas. *Bogan v. Scott-Harris,* 523 U.S. 44, 55 (1998).

La inmunidad legislativa o parlamentaria tiene dos (2) funciones: una sustantiva y otra evidenciaria. Es decir, no tan solo protege a los miembros de la Asamblea Legislativa de responsabilidad civil y criminal por actuaciones legítimas dentro de los procesos legislativos, sino que tampoco permite que estos sean parte de una acción civil relacionada con estas actuaciones, ni que testifiquen al respecto. *Pres. del Senado*, 148 DPR 737, 769 (1999). *Véase además In re* Figueroa Vivas, 149 DPR 557 (1999). "Limitarle a un miembro de la Asamblea Legislativa su función o prerrogativa de informar, fiscalizar o debatir asuntos de interés público necesariamente lacera las prerrogativas constitucionales de ese legislador causándole un daño real". *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920, 963 (2011).

Cónsono con estas disposiciones, los motivos que subyacen la actuación legislativa están completamente fuera del ámbito de revisión judicial. *Pres. del Senado*,

*supra*, pág. 769; *Romero Barceló v. Hernández Agosto,* 115 DPR 368, 379-380 (1984). De lo contrario, además de validarse una interferencia indebida de la Rama Judicial en los quehaceres de la Asamblea Legislativa, la inmunidad perdería todo su valor. Es fundamental destacar que el propósito de esta doctrina es precisamente preservar la independencia de la Rama Legislativa y así salvaguardar la separación de poderes. *Romero Barceló v. Hernández Agosto, supra,* pág. 379.

Empero, hemos sido consistentes en reiterar que las actuaciones de la Asamblea Legislativa no están exentas de revisión judicial. Es decir, la llamada inmunidad legislativa no es absoluta, "[c]orresponde a los tribunales, y no al Poder Legislativo, definir sus contornos". *Vélez Ramírez v. Colberg Toro, supra,* pág. 876 (citando a *Romero Barceló v. Hernández Agosto, supra*); *Silva v. Hernández Agosto, supra,* pág. 59.

Como ya hemos mencionado, desde *Silva v. Hernández Agosto, supra,* reconocimos que no todo acto legislativo está protegido, siendo imprescindible que distingamos entre un acto legislativo y una acción no legislativa.[8]

---

[8] Para ejemplificar la distinción de este razonamiento, en *Acevedo Vilá v. Aponte Hernández,* 168 DPR 443, 455-459 (2006), recurrimos a lo resuelto por otras jurisdicciones. Así, por ejemplo, destacamos cómo en el más alto foro del estado de Kentucky se concluyó que el acto de firmar una medida luego de que esta había sido aprobada por ambos cuerpos legislativos no constituye un acto discrecional legislativo del Presidente del Senado. Por el contrario, se consideró como un acto ministerial que de ser incumplido, procedería otorgar un *mandamus*. *Kavanaugh v. Chandler*, 72 S.W.2d 1003 (1934). Asimismo, destacamos cómo el Tribunal Supremo de Missouri concluyó que el acto de certificar al Gobernador electo no es uno legislativo, sino uno ministerial, independientemente de si es llevado a cabo por el

Por consiguiente, al momento de considerar la aplicación de la inmunidad parlamentaria, tenemos que ser bien cautelosos al establecer cuál es el acto que estamos protegiendo. Esto debido a que la inmunidad absoluta solamente aplica cuando el acto está enmarcado dentro de la capacidad legislativa. Como corolario, se ha concluido que el Presidente está cobijado por esta inmunidad cuando firma o veta una ley aprobada por el Congreso. Es decir, este acto está cobijado por absoluta inmunidad debido a que es considerado parte del proceso legislativo. *Torres Rivera v. Calderón Serra,* 412 F.3d 205, 213 (2005)(citando a *Smiley v. Holm*, 285 U.S. 355, 372-373 (1932); *Women´s Emergency Network v. Bush*, 323 F.3d 937, 950 (11mo Cir. 2003)); *Bogan v. Scott Harris,* 523 U.S. 44, 55 (1998). No obstante, las acciones que se toman para *implantar* la legislación no están cobijadas por la inmunidad legislativa, sino que deben ser evaluadas a la luz de la inmunidad cualificada. *Íd.,* pág. 214 (citando a *Scheuer v. Rhodes,* 416 U.S. 232 (1974)).[9]

---

Presidente de la Cámara de Representantes. *State v. Osburn*, 147 S.W.2d 1065 (1941). Luego de distinguir entre un acto legislativo y uno ministerial, en aquella ocasión concluimos que después de que un proyecto ha sido aprobado por ambas cámaras, la Asamblea Legislativa no tiene discreción para elegir si lo presenta o no ante el gobernador. Por consiguiente, este acto no está cubierto por la inmunidad legislativa, procediendo el recurso de *mandamus*. *Acevedo Vilá v. Aponte Hernández, supra*, pág. 464.

[9] En *Scheuer v. Rhodes, supra*, pág. 248, el Tribunal Supremo federal citó con aprobación las siguientes expresiones del Juez Hughes:

> If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases, the futility of which the

Cónsono con estas disposiciones, varias jurisdicciones han diferenciado un acto legislativo de uno administrativo con el propósito de otorgarle inmunidad absoluta solamente al primero. Para esto, han establecido que es preciso abordar la naturaleza de los hechos que subyacen el acto en controversia. Si estos hechos están basados en generalizaciones hechas en relación a la política pública adoptada, se consideran legislativos. Ahora bien, si los hechos que subyacen son más específicos, es decir, están relacionados a individuos o situaciones particulares, se consideran administrativos. Asimismo, se ha reconocido que se puede distinguir entre una acción administrativa y una legislativa mediante la particularidad del impacto de la acción. Es decir, cuando la acción concierne la aplicación de una política general podemos establecer que es legislativa. Sin embargo, cuando va dirigida a afectar a un ciudadano en particular, se considera administrativa. *Cutting v. Muzzey,* 724 F.2d 259, 261 (1er Cir. 1984). *Véase además Acevedo-Cordero v. Cordero-Santiago,* 958 F.2d 20, 23 (1er Cir. 1992); *Orange Lake Associates, Inc. v. Kirkpatrick*, 21 F.3d 1214 (2do Cir. 1994). Esta distinción entre un acto legislativo y uno administrativo también fue adoptada por el Tercer Circuito en *Flower-Nash v. Democratic Caucus of Pa. House*

---

State may at any time disclose by the simple process of transferring powers of legislation to the Governor to be exercised by him, beyond control, upon his assertion of necessity. Under our system of government, such a conclusion is obviously untenable.

*of Representatives,* 496 F.3d 328 (3er Cir. 2006). Para esto, además de considerar las expresiones del Primer Circuito en *Cutting v. Muzzey, supra,* el Tercer Circuito destacó cómo el análisis es cónsono con lo expuesto por el Tribunal Supremo de los Estados Unidos en *Forrester v. White,* 484 U.S. 219, 227 (1988).[10] *Flower-Nash v. Democratic Caucus of Pa. House of Representatives*, *supra,* págs. 332-333. El resultado de esta teoría es que puede ser que "un legislador no reciba inmunidad absoluta por acciones que son administrativas en su naturaleza, y por el contrario, un oficial ejecutivo reciba inmunidad absoluta por acciones que son legislativas en su naturaleza". *Miles-Un-Ltd., Inc. v. Town of New Shoreham, R.I.,* 917 F.Supp. 91, 99 (D. New Hampshire, 1996)(Traducción suplida).

A continuación esbozaremos algunas determinaciones a las que se han llegado aplicando la distinción entre un acto legislativo y uno administrativo. En *Negrón-Gaztambide v. Hernández-Torres,* 35 F.3d 25, 28 (1er Cir. 1994), el Primer Circuito concluyó que la destitución de la demandante, una bibliotecaria de la Oficina de Servicios Legislativos, fue un acto administrativo y por consiguiente, el demandado no estaba cobijado bajo la

---

[10] En esta ocasión, el Tribunal Supremo federal entendió que la destitución de un empleado hecha por el Juez White no estaba cobijada por la inmunidad judicial absoluta, debido a que este estaba actuando dentro de su capacidad administrativa. *Forrester v. White, supra,* pág. 229. En su análisis, el tribunal expresó que estaba siendo consistente con el tratamiento que se le había otorgado a la inmunidad, en cuanto se examinaban las funciones realizadas por el oficial y posteriormente se evaluaba si las actuaciones en controversia eran cónsonas con estas funciones. *Íd.,* pág. 224.

inmunidad legislativa absoluta, procediendo así la Demanda bajo el 42 U.S.C.A. sec. 1983.[11] Para sustentar esta conclusión, el Primer Circuito hizo referencia a *Forrester v. White, supra*, en la que el Tribunal Supremo federal determinó que un juez estatal actuó en su capacidad administrativa cuando destituyó a un subordinado. Por otra parte, en *Roberson v. Mullins,* 29 F.3d 132 (4to Cir. 1994), el Cuarto Circuito se enfrentó a la destitución de un miembro de una junta de directores de un *county* por su afiliación política. El Tribunal entendió que la destitución no estaba relacionada con el proceso legislativo, por consiguiente, la junta de directores no actuó dentro de sus capacidades legislativas, siendo inaplicable la inmunidad legislativa. Para ejemplos adicionales, véanse *Gross v. Winter,* 876 F.2d 165, 172-173 (D.C.Cir. 1989); *Raterree v. Rockett,* 852 F.2d 946 (7mo Cir. 1988).

A tenor con todas estas disposiciones, podemos concluir que para aplicar la inmunidad legislativa tenemos que considerar la naturaleza del acto en controversia,

---

[11] A pesar que citamos con aprobación esta jurisprudencia, es necesario hacer varios señalamientos. En primer lugar, en *Negrón Gaztambide v. Hernández Torres, supra,* se trataba de un bibliotecario, mientras que en *Vélez Ramírez v. Colberg Ramírez, supra,* se trataba del Director de la Biblioteca de Servicios Legislativos. Además de esto, en la controversia de autos no nos estamos enfrentando a un despido de personal legislativo. Por consiguiente, de ser planteado ante nuestra consideración, en su momento consideraremos la distinción entre un acto administrativo y legislativo, a la luz de *Forrester v. White, supra,* y la revocación expresa de *Browning v. Clerk,* 789 F.2d 923 (D.C.Cir. 1986) en *Fields v. Office of Eddie Bernice Johnson,* 459 F.3d 1 (D.C.Cir. 2006), en el contexto particular de un funcionario legislativo.

pues solamente está protegido aquel dirigido a establecer política pública y que es cónsono con los procesos legislativos. No podemos otorgarle la misma protección a aquellos actos cuya naturaleza es administrativa y van dirigidos a afectar a un individuo en particular.[12]

## F. La abolición de un cargo y posterior creación del mismo como subterfugio de la Asamblea Legislativa para la destitución de un empleado

Por otra parte, los demandados reiteradamente aducen que la derogación de la Ley Núm. 75-2013, *supra,* y la subsiguiente aprobación de la Ley Núm. 78-2013, *supra*, hacen que la remoción del Procurador sea una actuación válida del Gobernador en cumplimiento con la ley y no una destitución. Para esto, vehementemente citan lo resuelto por esta Curia en *Gómez v. Negrón,* 65 DPR 305 (1945). Particularmente, en lo concerniente a que cuando un incumbente acepta un cargo creado por la Asamblea Legislativa, lo hace bajo el entendido de que este puede ser abolido en cualquier momento. Por consiguiente, del

---

[12] Cónsono con esta distinción entre un acto legislativo y administrativo, es pertinente destacar que en *Baraka v. McGreevey*, 481 F.3d 187, 200 (3er Cir. 2007), el Tercer Circuito también reconoció una distinción entre eliminar la posición de un empleado público y la destitución de un solo individuo, estando la primera acción cobijada por la inmunidad legislativa, no así la segunda. El tribunal expresó que "despedir a un empleado en particular es una decisión de personal que no envuelve la creación de política pública". *Íd.* (citando a *In re* Montgomery County, 215 F.3d 367 (3er Cir. 2000) (Traducción suplida). Así, el Tribunal sostuvo la destitución de Baraka debido a que este no tenía un interés propietario sobre la posición de poeta, pues esta había sido abolida mediante un acto legislativo válido. Por consiguiente, la actuación del Gobernador fue un acto legislativo acreedor de protección. *Véase además Leapheart v. Williamson*, 705 F.3d 310 (8vo Cir. 2013). Esta jurisprudencia, contrario a lo argumentado por la Procuradora General, no es idéntica a la situación de autos debido a que en *Baraka v. McGreevy, supra*, el Tribunal no se enfrentó a que la Asamblea Legislativa posteriormente creara otro puesto igual al del empleado destituido, pero con otro nombre.

cargo ser abolido, no puede alegarse que al funcionario se le está privando de algún derecho constitucional. *Íd.*, pág. 312.

Ahora bien, para poder hacer un análisis responsable de estas expresiones, es menester reconocer que las mismas fueron hechas luego de que estableciéramos que este derecho está circunscrito a las limitaciones de la anterior Ley de Servicio Civil. Específicamente, dispusimos lo siguiente:

> Los casos resueltos por esta Corte sosteniendo la doctrina de que la abolición de un cargo y la creación de otro con distinto nombre pero con los mismos deberes y obligaciones, no priva al incumbente del primero del derecho a ser designado para el segundo, han sido casos no sólo de cargos o empleos dentro del Servicio Civil Clasificado, sino que los hechos han demostrado que el funcionario o empleado había adquirido un status permanente en dicho Servicio. *Véanse Cruz v. Buscaglia, supra; Rosario v. Cuevas, Comisionado,* 60 DPR 470; *Géigel Polanco v. Rivera Martínez,* 48 DPR 124 y *Romero v. Gore,* 46 DPR 408.

> Con las limitaciones que la Ley de Servicio Civil contiene para la protección de aquellos funcionarios o empleados que tengan reconocido un status permanente dentro del Servicio Clasificado, no existe, pues, lo que el peticionario califica de su 'status como funcionario público con derecho a permanecer en su puesto' por un término fijo, si la Legislatura ha tenido a bien abolir su puesto. *Íd.*, págs. 308-309 (Énfasis omitido).

Mediante estas expresiones, el Tribunal reconoció y validó lo dispuesto en *Rosario v. Cuevas, Comisionado,* 60 DPR 470 (1942). "Un mero cambio de nombre no es por sí solo suficiente para crear un nuevo cargo y abolir el que

existía anteriormente. Cuando se suprime un cargo y enseguida se crea otro bajo una nueva designación, pero con iguales deberes que el anterior, las cortes amparan al funcionario perjudicado, por entender que el cambio se ha hecho con el propósito de evadir las leyes del Servicio Civil".[13]    *Íd.*, págs. 476-477. Esta norma ha sido reiterada por esta Curia aún después de aprobada nuestra Constitución. *Véanse Caballero v. Romero Barceló,* 103 DPR 1, 4-5 (1974); *González v. Gobierno Municipal,* 101 DPR 755, 759 (1973); *Centeno Rivera v. Pacheco de Algarín,* 94 DPR 528, 533 (1967); *Figueroa v. López, Alcalde,* 89 DPR 474, 481 (1963). Por consiguiente, este Tribunal ha sido consistente en rechazar actuaciones de la Asamblea Legislativa que van dirigidas únicamente a destituir a un funcionario de su cargo.

Es a tenor con toda esta normativa que resolvimos *Gómez v. Negrón, supra.* Es precisamente por esta razón que en aquella ocasión analizamos si el cargo de Fiscal del Tribunal Supremo que fue creado era el mismo que el abolido por la Asamblea Legislativa. Luego de analizar ambos cargos, concluimos que la forma y el término de los nombramientos eran fundamentalmente diferentes. *Íd.*, págs. 310-311. Por consiguiente, se determinó que cuando existe

---

[13] En la situación de hechos que originó esta controversia, el cargo de taquígrafa fue abolido y posteriormente se creó el nuevo cargo de secretaria en la División de Edificios Públicos del Departamento de Interior. Ante estos hechos, confirmamos la Sentencia recurrida en la que se ordenó que la peticionaria continuara fungiendo como Secretaria debido a que no se debía permitir la abolición de un puesto con el solo propósito de deshacerse de la persona que lo ocupaba.

diferencia en la *naturaleza* de los cargos, no puede concluirse que el cargo anterior no fue abolido. Luego de haber llegado a esta conclusión y haber determinado que la Legislatura actuó dentro del ámbito de sus funciones, es que concluimos que el demandado no tenía el deber ministerial de nombrar al peticionario para el nuevo cargo creado. Es menester destacar que en todo este análisis fuimos muy cautelosos al garantizar que esto no implicaba que estábamos inmiscuyéndonos con los motivos que tuvo esta rama de gobierno para tomar su determinación, pues esto ciertamente constituiría una violación a la separación de poderes que sustenta nuestro sistema de gobierno. *Íd.*, pág. 314.

Por lo tanto, hoy reiteramos que un funcionario público no puede reclamar un interés propietario sobre un cargo que ostentaba cuando este ha sido eliminado por la Asamblea Legislativa. Esto aplica siempre y cuando la actuación no sea un subterfugio para destituir al empleado de su cargo, lo cual sucede cuando acto seguido a la derogación se crea otro cargo cuyos deberes y obligaciones son iguales al anterior, pero con otro nombre.

IV.

Luego de analizar el estado de derecho aplicable, nos corresponde atender las preguntas específicas ante nuestra consideración. Al analizar cuidadosamente los deberes que le fueron delegados al Procurador, no es correcto concluir

que este realizaba funciones estrictamente ejecutivas siendo imposible otorgarle el mismo tratamiento que al Director Ejecutivo del Consejo de Desarrollo Ocupacional en *Santana v. Gobernadora, supra.* Tampoco podemos concluir que el Procurador realizaba funciones cuasi-legislativas o cuasi-judiciales exclusivamente. *A contrario sensu*, como bien determinó el Tribunal de Distrito, nos estamos enfrentando a un empleado con funciones híbridas.

Como vimos, entre las funciones que la Asamblea Legislativa le delegó al Procurador estaba no tan solo colaborar con el Primer Ejecutivo en el desarrollo de programas para optimizar los servicios brindados a las personas con impedimentos, sino que de las leyes aprobadas se desprende la intención de crear una agencia con cierta independencia del Poder Ejecutivo con la capacidad de fiscalizar estos servicios. Como ya hemos descrito, una de las funciones principales del Procurador es investigar y llevar reclamaciones por actos violatorios contra esta población tanto contra agencias públicas como privadas.[14]

Este rol es tan primordial que la Asamblea Legislativa le otorgó al cargo un término de duración de diez (10) años con el propósito de que el Procurador pudiese ejercer sus funciones sin las presiones y los vaivenes políticos que afectan a los cargos que están circunscritos al término de nombramiento de un gobernante.

---

[14] *Véase Transcript of Civil Hearing Held Before the Honorable Judge Daniel R. Domínguez*, págs. 19-21.

Ciertamente este objetivo se cumple al otorgarle un término de nombramiento mayor al de la incumbencia de un gobernante. Por consiguiente, se dispuso que este solo podía ser destituido luego de que se le otorgara notificación y vista por haber sido negligente en el desempeño de sus funciones, haber omitido el cumplimiento de su deber o incurrido en conducta impropia.

Además, según destacado por el Tribunal de Distrito, el Art. 52 (c) del anterior Plan Núm.1-2011, *supra,* le otorgaba el beneficio al Procurador de, a su discreción, acogerse a la Ley de los Sistemas de Retiros de Empleados Públicos, 3 LPRA ant. Ap. XVII Ap. 52, lo cual es un beneficio que es otorgado a los empleados de carrera. Asimismo, según surge de la vista realizada en el Tribunal de Distrito, entre las funciones de este Procurador estaba implantar la Ley para las Personas con Impedimentos (ADA, por sus siglas en inglés), 42 U.S.C.A. sec. 12101, *et seq.,*[15] la cual tiene como norte salvaguardar los derechos de las personas con impedimentos. Además de las funciones de fiscalización exigidas por esta ley, según se desprende de la transcripción de la vista y ha sido reconocido por el Tribunal de Distrito, los fondos asignados a la OPPI provienen tanto del fondo general estatal como de fondos federales, los cuales el Procurador puede solicitar sin el aval del Gobernador de Puerto Rico.[16]

Es a raíz de la naturaleza de estas facultades y las

---

[15] *Íd.,* págs. 50-58.
[16] *Íd.,* págs. 92-93.

descritas anteriormente que podemos concluir que el Procurador es un empleado gubernamental cuyas funciones son híbridas, teniendo las cuasi-judiciales mayor peso que las ejecutivas, lo cual hace meritorio que para su destitución se demuestre justa causa. Es decir, el Procurador no es un empleado de libre remoción, sino que es acreedor de un interés propietario durante el término de su cargo.[17] Consecuentemente, el Gobernador está sujeto a las restricciones impuestas por la Asamblea Legislativa.

Al analizar la totalidad de las circunstancias entendemos que estas restricciones no violan la separación de poderes ni inciden en la capacidad del Gobernador de cumplir y hacer cumplir las leyes. A pesar que este funcionario colabora con el ejecutivo, estas no son sus únicas funciones. Por el contrario, la OPPI se creó como un ente fiscalizador independiente con el propósito de salvaguardar los intereses de la población de impedidos de nuestro País. Asimismo, entendemos que el Gobernador retiene suficiente poder para remover al Procurador mediante las causales de destitución dispuestas por ley, las cuales permiten que este sea destituido si actúa fuera del ámbito que le fue establecido en la ley.

Habiendo contestado esta interrogante en la afirmativa, nos corresponde concluir si a la luz de la

---

[17] Es preciso destacar que la parte demandada reconoció que de los estatutos en controversia se desprende que la intención legislativa fue otorgarle una expectativa de continuidad en el empleo al Procurador durante el término de su cargo. *Véase* Alegato de la Parte Demandada, pág. 8.

normativa enunciada el Procurador pierde su derecho propietario por la inmunidad legislativa, según alegado por los demandados y certificado por el Tribunal de Distrito. En particular, arguyen que el Procurador no fue destituido, sino que su cargo dejó de existir por virtud de una actuación legítima de la Asamblea Legislativa. Sin duda alguna, este planteamiento no procede en derecho.

En primer lugar, como bien hemos delimitado, la destitución de un empleado particular constituye un acto de naturaleza administrativa, no una actividad legislativa legítima, que no está cobijado bajo la inmunidad absoluta. Según se desprende de la situación de hechos ante nuestra consideración, al crearse la "nueva" Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico solo se destituyó al Procurador, no así a los restantes sesenta y ocho (68) empleados que allí laboraban. Los demandados alegan que esto no es óbice para concluir que el Procurador fue tratado diferente a los demás empleados, debido a que este no estaba cobijado bajo la Ley Núm. 184-2004, 3 LPRA sec. 1461, *et seq.*, conocida como Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico. Este argumento no nos persuade, pues como ya hemos concluido, el Procurador también ostentaba un interés propietario sobre su cargo durante el término de su nombramiento. Por consiguiente, concluimos que la destitución del Procurador no fue un

hecho generalizado cónsono con la implantación de política pública, sino que fue en contra de un individuo particular, siendo un acto que no está cobijado bajo la inmunidad absoluta.

Además, desde mediados del siglo pasado consistentemente hemos sostenido que este Tribunal no va a tolerar y, mucho menos ignorar, cuando la Asamblea Legislativa utiliza los poderes que le son delegados mediante nuestra Constitución como un subterfugio para no respetar el derecho propietario de un funcionario gubernamental. Esto es precisamente lo que sucedió en el caso de autos. La derogación del Plan Núm. 1-2011, *supra,* y consigo la Oficina del Procurador de las Personas con Impedimentos y la inmediata aprobación de la Ley Núm. 78-2013, *supra,* con la cual se creó la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico, constituye precisamente la práctica que hemos rechazado. Tal como discutimos anteriormente, no podemos concluir que con la aprobación de la Ley Núm. 78-2013, *supra,* se abolió el cargo del Procurador y se creó uno nuevo, por el contrario, se sostuvieron las funciones de la OPPI al igual que los deberes y obligaciones del Procurador.

Siendo así, es forzoso concluir que la naturaleza del cargo no fue alterada, simplemente se le cambió el nombre, pero los deberes y obligaciones se mantuvieron inalterados. Consecuentemente, el Procurador no perdió su

interés propietario porque la Asamblea Legislativa aboliera su cargo. Es decir, esta actuación no priva al Procurador de mantenerse ejerciendo sus funciones en la nueva Oficina, pues se ha mantenido la naturaleza de la anterior, lo que en última instancia implica que el cargo no fue abolido.

V

Por los fundamentos expuestos anteriormente, resolvemos que el Procurador solo puede ser destituido por las causales dispuestas en ley. Es decir, ostenta un derecho propietario limitado al término fijo de duración de su nombramiento.

Además, concluimos que la destitución del Procurador es un acto administrativo que no está cobijado por la inmunidad legislativa absoluta. Asimismo, el Procurador preserva su derecho propietario aun ante la actuación de la Asamblea Legislativa de derogar la Oficina del Procurador de las Personas con Impedimentos e inmediatamente crear la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico.

Se dictará Sentencia de conformidad.


Mildred G. Pabón Charneco
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Iván Díaz Carrasquillo<br><br>Peticionario<br><br>v.<br><br>Hon. Alejandro García Padilla<br><br>Recurrido | CT-2013-0018 | *Certificación*<br><br>*Interjurisdiccional* |

SENTENCIA

En San Juan, Puerto Rico, a 19 de junio de 2014.

Por los fundamentos expuestos anteriormente, resolvemos que el Procurador solo puede ser destituido por las causales dispuestas en ley. Es decir, ostenta un derecho propietario limitado al término fijo de duración de su nombramiento.

Además, concluimos que la destitución del Procurador es un acto administrativo que no está cobijado por la inmunidad legislativa absoluta. Asimismo, el Procurador preserva su derecho propietario aun ante la actuación de la Asamblea Legislativa de derogar la Oficina del Procurador de las Personas con Impedimentos e inmediatamente crear la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Presidenta señora Fiol Matta disiente con Opinión escrita. La Juez Asociada señora Rodríguez Rodríguez disiente con Opinión escrita. El Juez Asociado señor Martínez Torres emitió Opinión Particular de Conformidad a la que se une el Juez Asociado señor Kolthoff Caraballo.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Iván Díaz Carrasquillo

  Demandante        Certificación

    v.

             CT-2013-18

Hon. Alejandro García Padilla

  Demandado

Opinión Particular de Conformidad emitida por el Juez Asociado señor MARTÍNEZ TORRES a la cual se unió el Juez Asociado señor KOLTHOFF CARABALLO.

En San Juan, Puerto Rico, a 19 de junio de 2014.

Estoy conforme con la decisión del Tribunal. Sin embargo, el desarrollo de este caso en los tribunales federales después que emitimos el auto de certificación a petición del Tribunal Federal para el Distrito de Puerto Rico me llevan a hacer unas expresiones breves.

El propósito de una certificación interjurisdiccional es que el tribunal federal cuente con una determinación cierta del derecho local por parte del máximo foro judicial estatal. Esto permite que ese foro estatal delimite los linderos de su derecho y propicia así una

interrelación armoniosa entre ambas jurisdicciones que conviven en el mismo suelo. Guzmán Vargas v. Calderón, 164 DPR 220 (2005). La certificación interjurisdiccional permite "preservar y respetar la función prístina de las cortes estatales de interpretar y formular el derecho de los estados". Pan Ame. Comp. Corp. v. Data Gen. Corp., 112 DPR 780, 785 (1982). Este mecanismo provee a las partes una alternativa más eficiente, rápida y económica que la abstención Pullman, que obligaba a las partes a litigar un asunto de ley estatal a través de toda la jerarquía de tribunales estatales, desde la primera hasta la última instancia, y solo entonces se reanudaban los procedimientos en la corte federal. Railroad Comm'n of Tex. v. Pullman Co., 312 US 496 (1941). Véase Bellotti v. Beard, 428 US 132 (1976).

En este caso, el Tribunal Federal para el Distrito de Puerto Rico nos solicitó mediante certificación, que le contestemos, en síntesis, si el demandante, Iván Díaz Carrasquillo, tiene por virtud de su nombramiento de diez años a la posición de Procurador de las Personas con Impedimentos, un derecho a permanecer en el cargo hasta que se venza ese término, salvo que sea removido por justa causa como disponía el estatuto bajo el cual se le nombró. De no tenerlo, la Asamblea Legislativa podría, arguendo, eliminar el cargo mediante nueva legislación. El Estado Libre Asociado de Puerto Rico, parte demandada, sostiene que eso fue lo que sucedió aquí y que las Leyes Núm. 75 y

78 de 2013 eliminaron el cargo del demandante y crearon uno nuevo, al cual el gobernador puede nominar otra persona.

Pendiente de resolver la certificación ante nos, el Tribunal Federal de Apelaciones para el Primer Circuito emitió un dictamen revocando el *injunction* que mantenía al demandante en su puesto. El foro apelativo federal concluyó, citando una decisión nuestra, que el demandante Díaz Carrasquillo no tiene derecho al remedio interdictal porque la Asamblea Legislativa puede eliminar su puesto derogando la ley que lo creó. Díaz-Carrasquillo v. García-Padilla, No. 13-2277, *Slip Opinion*, (1er Cir.; 16 de abril de 2014). En otras palabras, el tribunal federal apelativo interpretó **nuestro** derecho para revisar el *injunction* preliminar emitido y al así proceder **contestó la interrogante que nosotros aceptamos resolver a petición del Tribunal Federal de Distrito**. La opinión del Tribunal Federal de Apelaciones para el Primer Circuito no es final y firme, pues está pendiente una solicitud de reconsideración (*rehearing*) *en banc*.

Siempre hemos sido deferentes con los foros federales al atender peticiones de certificación interjurisdiccional. Lo hacemos porque buscamos hacer efectivo un mecanismo eficiente y económico para que las partes tengan una interpretación concluyente de los asuntos no resueltos de la ley local que se plantean en los casos ante el foro federal. En fin, nuestro norte ha

sido cooperar con la que consideramos una jurisdicción hermana, para beneficio de las personas que acuden allí en busca de la reparación de un agravio.

En esta ocasión, sin embargo, no se nos trató como hermanos. Se ignoró nuestra intervención y no hubo deferencia hacia nuestro rol como intérpretes máximos del derecho local, contrario al propósito mismo del mecanismo de certificación. El foro apelativo federal procedió a interpretar nuestro derecho local en cuanto a la creación y abolición de agencias y posiciones estatales, a pesar que la deferencia aconsejaba esperar. Como se advierte de nuestra decisión de hoy, estamos ante un asunto no resuelto antes, contrario a lo que concluyó el Tribunal Federal de Apelaciones. "Speculation by a federal court about the meaning of a state statute in the absence of prior state court adjudication is particularly gratuitous when ... the state courts stand willing to address questions of state law on certification from a federal court." Arizonans for Official English v. Arizona, 520 US 43, 76 (1997), citando a Brockett v. Spokane Arcades, Inc., 472 US 491, 510 (1985) (O'Connor, J., concurriendo).

El federalismo y el respeto que merecen los procesos judiciales estatales exigen que los tribunales federales se abstengan de pasar juicio sobre cuestiones de derecho estatal certificadas al máximo foro judicial del estado, pues es a este último al que le corresponde establecer el precedente al respecto. "Through certification of novel or

unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save 'time, energy, and resources and hel[p] build a cooperative judicial federalism'." Arizonans for Official English v. Arizona, íd., citando a Lehman Brothers v. Schein, 416 US 386, 391 (1974).

Esa cooperación entre jurisdicciones hermanas se esfumó en este caso. Si esa va a ser la actitud del foro apelativo federal hacia este Tribunal las partes pagarán los costos de una litigación ineficiente. ¿Tendremos que actuar en el futuro bajo la premisa de que no vale la pena certificar una pregunta porque no se nos va a otorgar la deferencia debida? Espero que no. Pero algo debe quedar claro: La deferencia entre jurisdicciones hermanas es una avenida de dos direcciones.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Iván Díaz Carrasquillo

    Demandante

       v.                          CT-2013-18

Hon. Alejandro García Padilla

    Demandado

Opinión disidente emitida por la Jueza Presidenta señora FIOL MATTA

En San Juan, Puerto Rico, a 18 de junio de 2014.

Por entender que el recurso de certificación ante nuestra consideración se tornó improcedente tras la Opinión de la Corte de Apelaciones de los Estados Unidos para el Primer Circuito (Primer Circuito) en <u>Díaz Carrasquillo v. García-Padilla</u>,[18] disiento del curso de acción que hoy toma una mayoría del Tribunal. En su lugar, dejaría sin efecto el recurso de certificación para que el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (Tribunal de Distrito) tome la acción que corresponda a la luz de la decisión del Primer Circuito que constituye la ley de caso.

---

[18] <u>Díaz Carrasquillo v. García-Padilla</u>, 13-2277, 2014 WL 1613705 (1st Cir. Apr. 16, 2014)

I.

El 15 de agosto de 2011, el Lcdo. Iván Díaz Carrasquillo fue nombrado por el entonces Gobernador, Hon. Luis Fortuño Burset, y confirmado por el Senado, como Ombudsman de la Oficina del Procurador de las Personas con Impedimentos al amparo del Plan de Reorganización Núm. 1-2011, el cual disponía un término de diez (10) años para el nombramiento. No obstante, en el 2013 la Asamblea Legislativa aprobó la Ley 75-2013, la cual derogó el Plan de Reorganización Núm. 1-2011, eliminando así la Oficina del Procurador de las Personas con Impedimentos. También aprobó la Ley del Procurador de las Personas con Impedimentos, Ley Núm. 78-2013, que estableció la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado como una agencia separada e independiente de cualquier otra entidad.

El 16 de agosto de 2013, el Gobernador, Hon. Alejandro García Padilla, informó al licenciado Díaz Carrasquillo que había designado a la Sra. Margaret Morales como la persona que estaría a cargo de dirigir el proceso de transición que, en virtud de lo dispuesto en la Ley 75-2013 y la Ley 78-2013, debía llevarse a cabo entre la extinta Oficina del Procurador de las Personas con Impedimentos y la nueva Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico.

Por esta razón, el 27 de agosto de 2013, el licenciado Díaz Carrasquillo presentó la demanda de referencia en el foro federal alegando discriminación

política en violación a la Ley de Derechos Civiles federal[19] y violación al debido proceso de ley en la terminación de su empleo. También adujo que tenía un interés propietario sobre su puesto y que en la actuación del Gobernador había mediado negligencia provocándole daños que debían compensarse bajo el Art. 1802 de nuestro Código Civil.[20] Ese mismo día, presentó una moción titulada "*Urgent motion seeking temporary restraining orden & injunction*" en la que solicitó un interdicto preliminar a su favor para permanecer en su puesto.

El 28 de agosto de 2013, el licenciado Díaz Carrasquillo recibió una carta suscrita por la Secretaria de la Gobernación, Hon. Ingrid M. Vila Biaggi, en la que se le informó lo siguiente:

> Sirva la presente para informarle que el Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Alejandro J. García Padilla, el pasado 23 de agosto de 2013 designó al Sr. Ramón Calzada Jiménez como Procurador Interino de la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico, creada en virtud de la Ley 78-2013. Dicha designación fue notificada en el día de hoy.
>
> Como es de su conocimiento, conforme a lo dispuesto en las Leyes 75-2013 y 78-2013, la Oficina del Procurador de las Personas con Impedimentos creada en virtud del ahora derogado Plan de Reorganización Núm. 1 de 2011 dejó de existir. Según lo dispuesto en el Artículo 19 de la Ley 78-2013, los documentos, expedientes, materiales, equipos y fondos asignados a la extinta Oficina del Procurador de las Personas con Impedimentos debieron ser transferidos a la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico.

---

[19] *Civil Rights Act*, 42 U.S.C. sec. 1983.
[20] 31 LPRA sec. 5141.

> A esos efectos, y en aras de asegurar la marcha adecuada de los trabajos, el Procurador Interino tomará posesión del cargo inmediatamente. Asimismo, conforme a la disposición legal antes citada, es necesario que, de no haberlo hecho, usted entregue al Procurador Interino el control de todo documento, expediente, materiales, equipo, fondos, recurso y propiedad que pertenecía a la Oficina del Procurador de las Personas con Impedimentos, así como cualquier informe necesario para garantizar la continuidad de los servicios al pueblo de Puerto Rico.

Luego de varios trámites procesales, el 26 de septiembre de 2013, el Tribunal de Distrito emitió una "*Opinion and order*" mediante la cual hizo varias determinaciones y nos certificó cuatro preguntas relacionadas con la demanda presentada por el licenciado Díaz Carrasquillo. En primer lugar, determinó que el puesto que ocupa el licenciado Díaz Carrasquillo es de naturaleza híbrida, pues comprende algunas funciones que son puramente ejecutivas, otras cuasi judiciales y algunas cuasi legislativas. En segundo lugar, concedió al demandante un interdicto preliminar para que permanezca en su puesto durante la duración del pleito. Finalmente, y en cuanto a lo que nos concierne como foro estatal, el Tribunal de Distrito señaló que no encontró en la jurisprudencia puertorriqueña algún caso en el que hayamos considerado las implicaciones de una posición híbrida como esta. Tras recalcar que esta clasificación es determinante para resolver si procede o no la demanda, el Tribunal de Distrito nos refirió las siguientes cuatro preguntas:

(1)     ¿Tiene el Procurador para las Personas con Impedimentos, por razón de sus funciones, un derecho propietario limitado sobre su puesto durante el término de su nombramiento, sujeto a "justa causa" según definido por ley?[21]

(2)     ¿Debe considerarse que las restricciones de "justa causa" impuestas al Gobernador para remover al demandante de su puesto interfieren con su facultad de llevar a cabo sus deberes constitucionales y de ejecutar propiamente las obligaciones de su cargo?[22]

(3)     ¿Qué factores debe utilizar la Corte al realizar esta determinación?[23]

(4)     Si se reconoce un interés propietario limitado bajo el derecho puertorriqueño, ¿lo pierde el demandante bajo la doctrina de inmunidad legislativa según alegado por la parte demandada?[24]

Esa orden fue presentada ante este Foro como recurso de certificación interjurisdiccional el 7 de octubre de 2013. Luego, el Tribunal de Distrito nos envió copia de las últimas entradas al expediente de la demanda federal en controversia. Estas indican que, el 4 de octubre de 2013, la parte demandada presentó un recurso de apelación ante el Primer Circuito cuestionando, entre otras cosas, el recurso de certificación interjurisdiccional que hoy nos ocupa.

---

[21] Does the Ombudsman for Persons with Disabilities of Puerto Rico, because of his functions, enjoy a limited property right to remain in his position for the duration of his fixed term subject to "just cause" as defined by law?

[22] Should "just cause" restrictions imposed on the Governor for removing Plaintiff from his position be considered an interference with Governor's ability to perform his constitutional duty and properly execute the duties of his office?

[23] What factors should the Court utilize when making such a determination?

[24] If there is limited property right under Puerto Rico law, does Plaintiff lose his right under the doctrine of legislative immunity as asserted by Defendants?

El 16 de abril de 2014, el Primer Circuito revocó la orden del Tribunal de Distrito por entender que el foro inferior había errado al concluir que el demandado tenía altas probabilidades de prevalecer en los méritos.[25] Razonó que el Tribunal de Distrito fundamentó su orden en premisas erradas, puesto que ignoró el hecho de que el señor Díaz Carrasquillo no fue removido del cargo, sino que la posición fue eliminada por ley. Así pues, dejó sin efecto el *injunction* preliminar emitido por el Tribunal de Distrito y devolvió el caso para la continuación de los procedimientos. Inconforme, el demandante solicitó que su caso se viera "*en banc*" ("*Petition for rehearing en banc*"). En su moción, solicitó que el Primer Circuito se abstuviera de resolver hasta tanto este Tribunal se expresara sobre las preguntas certificadas. El 9 de mayo de 2014, el Primer Circuito denegó esa moción.[26]

Aún inconforme, el señor Díaz Carrasquillo presentó ante esta Curia una "Moción urgente solicitando orden de paralización en auxilio de la jurisdicción de este Tribunal". El demandante solicitó que paralizáramos los efectos del dictamen emitido por el Primer Circuito. Oportunamente, la Procuradora General se opuso. Señaló que "dicho escrito presenta una solicitud sin precedente y abiertamente contraria a derecho, mediante la cual el demandante pretende que este Honorable Tribunal actúe

---

[25] Díaz Carrasquillo v. García-Padilla, *supra*.

[26] Véase, *Order of the Court*. Anejo 1 de la "Urgente Oposición a 'Moción urgente solicitando orden de paralización en auxilio de la jurisdicción de este tribunal´".

sin jurisdicción e interfiera indebidamente con un dictamen emitido por un foro federal, revisando colateralmente un dictamen del Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito". Luego, el demandante presentó una réplica en la cual reiteró sus reclamos y rebatió varios argumentos de la Procuradora General. A su vez, la Procuradora General presentó una breve dúplica a la réplica. Por último, la parte demandante presentó una "Moción urgente en torno a dúplica de la parte demandada".

Ante esta situación, una mayoría de este Tribunal decidió contestar las preguntas certificadas –junto a otras que no fueron incluidas en el recurso- y emite hoy una opinión consultiva que no tendrá efecto alguno sobre la resolución final del caso ante el Tribunal de Distrito. Este proceder nos coloca en una situación antagónica frente a la jurisdicción federal.

## II.

El recurso de certificación interjurisdiccional es un mecanismo procesal en virtud del cual "las cuestiones dudosas o no resueltas en el derecho estatal son transferidas directamente al foro de mayor jerarquía del estado mediante la certificación por la Corte federal de preguntas específicas para una cuestión definitiva que obligue a las partes".[27] Este mecanismo permite mitigar las tensiones inherentes a un sistema de justicia federativo en el que coexisten dos sistemas judiciales

_____

[27] Pan Ame. Comp. Corp. v. Data Gen. Corp., 112 DPR 780, 785 (1982).

soberanos: el federal y el estatal.[28] Con relación a los

requisitos particulares para que se conceda la

certificación, el Art. 3.002(g) de la Ley de la

Judicatura,[29] dispone que el Tribunal Supremo de Puerto

Rico:

> mediante auto de certificación, podrá
> conocer de cualquier asunto que le fuere
> certificado por el Tribunal Supremo de
> Estados Unidos de América, un Tribunal de
> Apelaciones de Circuito de Estados Unidos de
> América, un Tribunal de Distrito de Estados
> Unidos de América o el más alto tribunal
> apelativo de cualesquiera de los estados de
> Estados Unidos de América, cuando así lo
> solicite cualesquiera de dichos tribunales,
> de existir ante el tribunal solicitante
> cualquier asunto judicial en el que estén
> implicados [sic] cuestiones de derecho
> puertorriqueño **que puedan determinar el**
> **resultado del mismo y respecto al cual, en**
> **la opinión del tribunal solicitante, no**
> **existan precedentes claros en la**
> **jurisprudencia de este Tribunal.**[30]

Es decir, para que proceda una certificación, la

controversia tiene que involucrar cuestiones de derecho

puertorriqueño que sean determinantes para el resultado

del caso, no deben existir precedentes claros en la

jurisprudencia de este Foro y la solicitud debe incluir

una relación de todos los hechos relevantes a dichas

interrogantes.[31]

Sobre esta facultad hemos expresado que: "nuestra

capacidad de conocer en materia de certificación no es

absoluta".[32] Estamos limitados a las interrogantes

---

[28] Santana v. Gobernadora, 165 DPR 28, 42 (2005).
[29] Ley Núm. 201-2003, 4 LPRA sec. 24, *et seq.*
[30] 4 LPRA sec. 24s(g). (Énfasis suplido).
[31] Pan Ame. Comp. Corp. v. Data Gen. Corp., *supra*, en la pág. 788.
[32] Smyth, Puig v. Oriental Bank, 170 DPR 73, 77 (2007) (Voto de Conformidad, Juez Hernández Denton).

presentadas por el tribunal federal de que se trate. Esto, pues el foro de origen es el que mantiene jurisdicción sobre los méritos finales del caso, mientras que el tribunal que recibe la consulta circunscribe su participación a contestar las preguntas certificadas. A tono con lo anterior, la autoridad de este Tribunal en un recurso de certificación se limita a atender las interrogantes presentadas por el Tribunal de Distrito, pues si bien tenemos jurisdicción sobre el asunto certificado, no la tenemos sobre los méritos de la reclamación que pende ante el foro federal.

## III.

En este caso, el Tribunal de Distrito nos certificó cuatro interrogantes. Todas se refieren a la aplicabilidad de la jurisprudencia sobre la remoción de funcionarios ejecutivos, las funciones cuasi-legislativas y las cuasi-judiciales de un funcionario ejecutivo y sobre el poder de remoción del Gobernador. Mientras la petición de certificación estaba ante nuestra consideración, el Estado acudió al Primer Circuito. Ese foro acogió el recurso y revocó la decisión del Tribunal de Distrito que concedió el *injunction* preliminar a favor del señor Díaz Carrasquillo.

En su Opinión, el Primer Circuito señaló que: "el tribunal de distrito obvió un factor material que ameritaba un peso significante ---realmente la tesis

central del argumento del apelante".[33] El hecho material al que se refería el Primer Circuito es que el puesto del señor Díaz Carrasquillo fue abolido por la Ley Núm. 75-2013, *supra*. Continúa el Primer Circuito expresando lo siguiente:

> Díaz no argumentó que la Legislatura no tenía el poder de abolir su posición de Procurador. En vez, niega la existencia de ese hecho histórico. Específicamente, alega que el trámite legislativo no revela la intención de eliminar su posición como Procurador y que la Ley 78 no provee expresamente para su destitución. Aunque quizás sea correcto, este argumento no atiende la controversia. El Artículo 75, luego de proveer numerosas razones para ello, sin lugar a dudas deroga el Plan de Reorganización que creó el puesto de Díaz. Al hacerlo, la Legislatura abolió la posición del Procurador.
>
> **Aunque el poder de la Legislatura está delimitado por las constituciones estatal y federal, en este caso no hay ningún reclamo válido de que la abolición de la Oficina del Procurador de las Personas con Impedimentos viola de por sí alguna disposición constitucional.** Díaz levanta un argumento de retroactividad, citando el derecho puertorriqueño para sostener que mediante legislación no se pueden eliminar derechos previamente adquiridos. **Pero, nuevamente, aunque esto puede ser correcto, está fuera de lugar. Díaz no tiene ningún interés propietario, es decir, ningún 'derecho' a su posición como Procurador. Más aún, si pudiera identificar un interés propietario válido al amparo del Derecho de Puerto Rico, 'el proceso legislativo en sí le proveyó su debido proceso de ley'".[34]**

---

[33] "[T]he district court ignored a material factor deserving significant weight ---indeed the central thesis of appellant's argument". <u>Díaz Carrasquillo v. García-Padilla</u>, *supra*, en la pág. 4.

[34] "Díaz does not argue that the Legislature lacked the power to abolish his Advocate position. Instead, he disputes the existence of that historical fact. Specifically, he claims that the legislative history does not evince an intent to eliminate Díaz's Advocate position and that Law 78 does not explicitly provide for his removal. While perhaps accurate, this argument misses the

Concluye el Primer Circuito que:

> Al alegar que es inconstitucional abolir la posición de Procurador sin una vista individualizada, Díaz le pide a la corte federal que restrinja la facultad de la Legislatura de restructurar su personal. 'Nuestra Constitución, sin embargo, no contiene tal restricción federal' 'Todo gobierno competente debe tener el poder general de promulgar y derogar leyes; y el poder para crear, cambiar o descontinuar las entidades designadas para ejecutar esas leyes'.[35]

Una simple lectura de la Opinión del Primer Circuito denota que las interrogantes certificadas por el Tribunal de Distrito estaban basadas en premisas erradas y que el foro intermedio se vio obligado a reenfocar el análisis que debe realizar el foro inferior a la luz de las alegaciones del señor Díaz Carrasquillo.

---

point. Article 75, after providing numerous reasons for doing so, unambiguously repealed the very Reorganization Plan which created Díaz's job. In so doing, the Legislature abolished the position of Advocate.

[…] **While the legislature's power is bounded by the state and federal constitutions, there is no viable claim here that the abolition of the Advocate Office independently violated some constitutional proscription.** Díaz asserts a retroactivity argument, citing Puerto Rico law for the proposition that later legislation cannot take away previously acquired rights. But again, while that may [be] an accurate statement of the law, it is misplaced here. **Díaz had no property interest, i.e. no 'right' in the Advocate position. Moreover, even if he could identify a valid property interest created by Puerto Rico law, 'the legislative process itself provide[d] [him] with all the 'process' [he] was 'due'".** Íd. en las págs. 3-4. (Citas internas omitidas). (Énfasis suplido).

[35] "…[B]y claiming that it is unconstitutional for Puerto Rico to abolish the Advocate position without an individualized hearing, Díaz is asking the federal court to constrain the Puerto Rico Legislature's ability to restructure its workforce. 'Our Constitution, however, embodies no such federal constraint....' '[I]n every perfect or competent government, there must exist a general power to enact and to repeal laws; and to create and change or discontinue, the agents designated for the execution of those laws'. Íd.

Esto, a su vez, tornó en inmeritoria la petición de certificación que tenemos ante nuestra consideración. Por ello, lo único que procede en esta etapa procesal es dejar sin efecto el auto de certificación.

Hemos explicado que: "la certificación no puede eludir el principio fundamental que fija el sentido y propósito de la función judicial, el de [sic] que **ésta sólo puede ejercerse para resolver controversias concretas, reales y efectivas entre litigantes que reclaman derechos opuestos ante el Tribunal**" y que "es necesario, por lo tanto, que la certificación satisfaga cabalmente este principio elemental de justiciabilidad no solo en nuestro foro, sino, además, en el foro federal".[36]

Tras la decisión del Primer Circuito, el recurso de certificación interjurisdiccional no es justiciable toda vez que las preguntas certificadas no son determinantes para el resultado del caso. Específicamente, el asunto de umbral sobre el poder de la Asamblea Legislativa de eliminar el puesto del demandante no fue referido a nuestra atención. Además, según señalado por el Primer Circuito, la verdadera controversia del caso ya fue atendida por este Tribunal en Gómez v. Negrón Fernández[37] por lo que tampoco se cumple con la exigencia de que no haya un precedente claro en nuestro ordenamiento. Más aún, la Opinión del Tribunal elabora y atiende controversias más allá de las cuatro interrogantes

---

[36] Pan Ame. Comp. Corp. v. Data General Corp., supra, en las págs. 785-786. (Énfasis suplido).
[37] Gómez v. Negrón Fernández, 65 DPR 305 (1945).

referidas por el Tribunal de Distrito. Reiteramos que ya el Primer Circuito aplicó el precedente de Gómez v. Negrón Fernández[38] y resolvió que la Asamblea Legislativa tenía la potestad de eliminar el puesto en controversia y que el señor Díaz Carrasquillo no tenía un derecho propietario sobre su puesto. Es por eso que los pronunciamientos de la mayoría constituyen una mera opinión consultiva.[39]

IV.

La decisión que hoy se emite vulnera los principios rectores del recurso de certificación interjurisdiccional y representa una intervención indebida y errada con la jurisdicción federal que contraviene nociones básicas de justiciabilidad. Una vez el Primer Circuito revocó al Tribunal de Distrito y reenfocó la controversia del caso, lo único que restaba por hacer era dejar sin efecto el recurso de certificación; emitir una Opinión en esta etapa del proceso es impropio e improcedente en derecho. Resulta aún más preocupante que la mayoría no solo conteste las interrogantes certificadas, sino que resuelva en los méritos el reclamo del demandante utilizando el marco de referencia equivocado adoptado por el Tribunal de Distrito federal y revocado por el foro apelativo de ese sistema por ser claramente erróneo. Incluso, llama la atención que la decisión del Primer Circuito amerita tan

---

[38] Íd.
[39] Recordemos que en nuestra jurisdicción "no es función de los tribunales actuar como asesores o consejeros". Ortiz v. Panel del F.E.I., 155 DPR 219, 251-252 (2001).

solo una escueta nota al calce en la Opinión mayoritaria.

Por todo lo anterior, disiento.


Liana Fiol Matta
Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| IVÁN DÍAZ CARRASQUILLO | | |
|---|---|---|
| Peticionario | | |
| v. | | |
| HON. ALEJANDRO GARCÍA PADILLA, GOBERNADOR DE PUERTO RICO | CT-2013-0018 | Certificación |
| Recurrido | | |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 19 de junio de 2014

Disiento enérgicamente del curso seguido por una mayoría de este Tribunal por entender que mediante la opinión que hoy se emite se quebrantan los principios de autolimitación judicial y la doctrina de justiciabilidad. Las preguntas certificadas ante nuestra consideración no cumplen con los requisitos de justiciabilidad para una certificación interjurisdiccional, por lo que estamos impedidos de atender las cuestiones presentadas. Además, disiento por entender que, en el interés de trazar la política pública del país desde el estrado, la mayoría emite un juicio consultivo sobre cuestiones que no fueron presentadas ante este Foro y que *de facto* fueron atendidas por el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito en Boston. En claro desafío a las normas más básicas de un sistema judicial federalista, la mayoría

pretende revocar las determinaciones del Tribunal de Apelaciones para el Primer Circuito.

Mediante un galimatías jurídico se pretende atornillar en su puesto no tan sólo al Procurador de las Personas con Impedimentos sino también a otros funcionarios nombrados el cuatrienio pasado por una administración contraria a la que hoy dirige el gobierno. Ello así pues, como sabemos, la presente administración, como parte de un proceso de reorganización del gobierno ante las dificultades fiscales que atraviesa, ha propuesto que las procuradurías así como otros organismos gubernamentales, se eliminen y que sus funciones sean absorbidas por distintas agencias de gobierno. Por tanto, esta opinión consultiva no sólo pretende afectar al Procurador de las Personas con Impedimentos sino que adelanta el criterio de este Tribunal sobre todos aquellos otros funcionarios que se verían afectados por la restructuración gubernamental.

Más grave aún, con este dictamen se quiere impedir que la Asamblea Legislativa cumpla con su responsabilidad constitucional de legislar la política pública de una Administración. En el pasado reciente indiqué, en ocasión de otro dislate judicial, que en el futuro "ante un resultado electoral desfavorable para ciertos sectores del país" seríamos testigos de actuaciones cuyo propósito consistiría en "impedir que la siguiente administración del gobierno pudiera. . .darle curso a su proyecto de país". *In re Solicitud Aumentar Núm. Jueces TS*, 180 D.P.R. 54, 142

(2010) (Rodríguez Rodríguez, J., Opinión disidente). ¡Qué lástima para el país que tuviera razón!

Examinemos los hechos del caso según éstos surgen de la solicitud de certificación del Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico y los documentos que la acompañan.

I

El 22 de junio de 2011, el entonces Gobernador de Puerto Rico y presidente del Partido Nuevo Progresista ("P.N.P."), Hon. Luis G. Fortuño Burset, firmó y convirtió en ley el Plan de Reorganización Núm. 1 de 2011, conocido como el Plan de Reorganización de las Procuradurías ("Plan de Reorganización"). Este Plan reorganizó la estructura vigente que regía la administración y operación de las distintas procuradurías del País[40] mediante la derogación de todas las leyes que regían tales entidades gubernamentales, y la creación de la Oficina de la Administración de las Procuradurías, a la cual se le concedieron nuevas funciones, y se le delegaron las que tenían las procuradurías hasta entonces vigentes.[41] A esos efectos, el Plan de Reorganización consistió en tres

---

[40] En específico, el Plan reorganizó la estructura vigente que regía la administración y operación de las siguientes oficinas: la Procuraduría de las Personas con Impedimentos, la Procuraduría de la Salud, la Procuraduría de Personas Pensionadas y de la Tercera Edad y la Procuraduría del Veterano.

[41] Mediante esta Ley, se derogó la Ley Núm. 2 de 27 de septiembre de 1985, la Ley Núm. 57 de 27 de junio de 1987, la Ley Núm. 11 de 11 de abril de 2001, la Ley Núm. 203 de 7 de agosto de 2004 y se enmendó la Ley Núm. 203 de 14 de diciembre de 2007.

etapas simultáneas, a saber: la eliminación de las Procuradurías existentes al derogar las leyes que las crearon; la creación de la Oficina de Administración de las Procuradurías, oficina en la que se consolidaron todas las facultades, funciones y deberes administrativos de las Procuradurías; y la creación de las nuevas Procuradurías, entre éstas la Procuraduría de las Personas con Impedimentos, las cuales estaban adscritas a la administración de la Oficina de Administración de las Procuradurías.[42]

Debido a la creación de las nuevas procuradurías, en el Plan de Reorganización se dispuso que los procuradores de cada oficina serían nombrados por el Gobernador de Puerto Rico, con el consejo y consentimiento del Senado, por un término de diez (10) años. Por tal razón, quienes hasta entonces ocupaban la dirección de las procuradurías abolidas por el Plan de Reorganización cesaron en sus funciones, y el Gobernador inició un proceso de nombramiento o renombramiento con respecto a las Procuradurías recién creadas. Conforme a las disposiciones del Plan de Reorganización, el 15 de noviembre de 2011, el entonces Gobernador de Puerto Rico, Hon. Luis G. Fortuño Burset, nombró al señor Iván Díaz

---

[42] Anterior a esta legislación, las procuradurías funcionaban como entes independientes. A manera de ilustración, en el artículo 3 de la Ley Núm. 2 de 27 de septiembre de 1985, se especificaba que se creaba la Oficina del Procurador de las Personas con Impedimentos, "como una entidad jurídica, independiente y separada de cualquier otra agencia o entidad pública".

Carrasquillo al puesto de Procurador de las Personas con Impedimentos por un término de diez (10) años.

El 6 de noviembre de 2012, el Hon. Alejandro García Padilla, senador y presidente del Partido Popular Democrático ("P.P.D."), fue electo al cargo de Gobernador del Estado Libre Asociado de Puerto Rico en las elecciones generales del País. Asimismo, la señora Rossana López León fue electa al cargo de Senadora por Acumulación en el Senado de Puerto Rico como miembro del P.P.D. El 5 de febrero de 2013, la ahora senadora López León presentó varios proyectos relacionados con el funcionamiento y la administración de las Procuradurías en Puerto Rico para mejorar el servicio que ofrecen.

En lo que atañe a la controversia ante nuestra consideración, los proyectos P. del S. 352 y P. del S. 355 presentados por la Senadora se convirtieron en la Ley Núm. 75 de 24 de julio de 2013 ("Ley Núm. 75") y en la Ley Núm. 78 de 24 de julio de 2013 ("Ley Núm. 78"), respectivamente. Específicamente, en la Ley Núm. 75 se dispuso que entraría en vigor en un término de treinta (30) días a partir de su aprobación, término que se utilizaría para transferir todo tipo de recursos de la abolida Oficina de Administración de Procuradurías a las Procuradurías de recién creación, entre éstas, la Procuraduría para las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico ("Procuraduría para las Personas con Impedimentos"). Así las cosas, durante el

periodo de transición, el señor Iván Díaz Carrasquillo recibió una notificación de que el Gobernador había designado a la señora Margaret Morales para dirigir el Comité de Transición, en virtud de lo dispuesto en la Ley Núm. 75 y la Ley Núm. 78. La notificación indicaba que la señora Margaret Morales habría de encargarse de dirigir la transición entre "la extinta Oficina del Procurador de las Personas con Impedimentos y la nueva Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico". Apéndice del recurso de certificación interjurisdiccional, Documento 20-5, pág. 1.

A tales efectos, para finales del mes de agosto, miembros del Comité de Transición sostuvieron varias reuniones con el señor Díaz Carrasquillo para finiquitar todo lo relacionado con el proceso de transición. Finalizadas las reuniones de transición entre miembros del Comité de Transición y el señor Díaz Carrasquillo, a éste se le notificó que había cesado sus funciones como Procurador de las Personas con Impedimentos. Posteriormente, el 26 de agosto de 2013 el señor Díaz Carrasquillo supo que el Gobernador se disponía a nombrar a un Procurador Interino para dirigir la Oficina de la Procuraduría de las Personas con Impedimentos y que, además, se estaban evaluando candidatos para ocupar el cargo de Procurador en propiedad. Luego, mediante carta suscrita por la Secretaria de la Gobernación, Hon. Ingrid M. Vila Biaggi, se le informó que el Gobernador había

nombrado al señor Ramón Calzada como Procurador Interino de las Oficina del Procurador de las Personas con Impedimentos.

El 27 de agosto de 2013, el señor Díaz Carrasquillo presentó ante el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico ("Tribunal de Distrito") una demanda por discrimen político, violación a su derecho al debido proceso de ley, y daños y perjuicios, en contra de las siguientes personas: el Gobernador de Puerto Rico, Hon. Alejandro García Padilla, en su carácter personal y oficial; la senadora Rossana López León, en su carácter personal y oficial; la señora Margaret Morales, en su carácter personal y oficial como miembro del Comité de Transición; y el señor Gabriel Esterrich Lombay, en su carácter personal y oficial como miembro del Comité de Transición.

En síntesis, alegó que su destitución estuvo motivada por razones de índole político-partidista por éste ser afiliado del P.N.P. Indicó que la acción del Gobernador vulneraba su derecho a la libertad de expresión y su derecho a la libertad de asociación. Aseveró que por haber sido nombrado por un término de diez (10) años, término que no había vencido, tenía un derecho propietario sobre su puesto y sólo podía ser removido por justa causa y conforme al debido proceso de ley. El demandante solicitó una partida en daños y que se dictara un remedio interdictal de suerte que pudiera permanecer en su puesto.

El 28 de agosto de 2013, el Tribunal de Distrito emitió una Orden en la que concedió la orden de interdicto provisional y solicitó a las partes mostrar causa por las cuales el Tribunal no debía conceder el remedio de permitir que el demandante permaneciera en su empleo, según solicitó, siendo éste un funcionario ejecutivo con funciones cuasi judiciales. A su vez, solicitó al demandante demostrar la naturaleza del interés propietario que reclamaba sobre su empleo.

El 3 de septiembre de 2013, el demandante presentó una moción en cumplimiento con la orden y en ésta hizo los señalamientos que sintetizamos a continuación. Alegó que se le había violado su derecho a la libertad de expresión toda vez que la razón para removerlo de su posición era por su afiliación al P.N.P. Además, sostuvo que debido a que su nombramiento había sido por un término de diez (10) años a una posición ejecutiva que ejerce funciones cuasi judiciales tiene un derecho propietario sobre su empleo y sólo podía ser removido por justa causa. Por tanto, señaló que se violó su derecho a un debido proceso de ley al no habérsele entregado una carta de terminación y haber sido removido de su posición sin cumplir con el requisito de justa causa.

En esa misma fecha, la parte demandada presentó una moción en cumplimiento con la orden emitida por el Tribunal de Distrito. En lo pertinente, sostuvo que el señor Díaz Carrasquillo no había sido destituido o

despedido de su empleo sino que al haberse derogado el Plan de Reorganización que creaba su puesto y haberse creado una nueva Oficina del Procurador General para las Personas con Impedimentos, en virtud de la Ley Núm. 75 y la Ley Núm. 78, sus funciones habían cesado. Añadió que, según lo resuelto en *Gómez v. Negrón Fernández*, 65 D.P.R. 286 (1945), la derogación del Plan de Reorganización y la creación de la nueva Procuraduría daban cuenta del cese de sus funciones.

Por tal razón, sostuvo que el señor Díaz Carrasquillo no tenía un derecho propietario sobre su empleo debido a que la Asamblea Legislativa, acorde con su poder constitucional, abolió el puesto del señor Díaz Carrasquillo mediante la derogación del Plan de Reorganización y creó la nueva Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico, Oficina que encaraba nuevas facultades y responsabilidades. Además, alegó que de concederse el remedio interdictal solicitado, se violaría el principio de inmunidad soberana que establece la Enmienda XI de la Constitución de los Estados Unidos. Const. EE.UU. enmda. XI.

Ese mismo día, el señor Díaz Carrasquillo presentó su oposición a la moción presentada por la parte demandada. Allí negó que su puesto haya dejado de existir por razón de la derogación del Plan de Reorganización y la creación de una nueva Oficina del Procurador, puesto a que las

funciones de la nueva Oficina del Procurador eran esencialmente las mismas que tenía la Oficina del Procurador bajo el Plan de Reorganización. Por consiguiente, sostuvo que no aplicaba la doctrina establecida en *Gómez,* 65 D.P.R. 286. No obstante, añadió que la aplicación de tal doctrina, según alegada por la parte demandada, era contraria a lo resuelto en *Colón v. Policía de Puerto Rico*, 177 D.P.R. 121 (2009), donde se sostuvo que ni la Asamblea Legislativa ni el Gobernador pueden aprobar leyes que lesionen o ignoren los derechos adquiridos de un ciudadano. Finalmente, alegó que la sección 1983 del Código de Estados Unidos, 42 U.S.C. §1983, permite que se demande al Estado cuando se violan los derechos, privilegios e inmunidades que garantizan las leyes y la Constitución de los Estados Unidos. Por ende, sostuvo que no procedía la doctrina de inmunidad soberana.

Luego de varios trámites procesales, el Tribunal de Distrito citó a las partes a que comparecieran a una vista argumentativa para dilucidar si el Procurador de las Personas con Impedimentos, tanto bajo el Plan de Reorganización como bajo la Ley Núm. 78, ejerce funciones cuasi ejecutivas y cuasi judiciales. Trabada así la controversia, el 27 de septiembre de 2013 el Tribunal de Distrito expidió un *injunction* preliminar a favor del demandante por entender que éste tenía la probabilidad de prevalecer en los méritos toda vez que demostró que el

Procurador de las Personas con Impedimentos ejerce funciones cuasi ejecutivas y cuasi judiciales.

No obstante, por tener reservas en cuanto al estado de Derecho puertorriqueño sobre la constitucionalidad de imponer un requisito de justa causa a las facultades del Gobernador para remover a un funcionario que ejerce funciones cuasi ejecutivas y cuasi judiciales, certificó las siguientes preguntas: Si el Procurador de Personas con Impedimentos de Puerto Rico tiene un derecho propietario limitado sobre su empleo por el resto del término de su nombramiento, sujeto al requisito de "justa causa" según definido por la ley. Si el requisito de "justa causa" impuesto al Gobernador para la remoción del demandante de su empleo constituye una interferencia con las facultades del Gobernador de cumplir y hacer cumplir las leyes, al igual que su facultad de formular e implementar la política pública. Qué factores debe considerar el tribunal al hacer tal determinación y, de existir un derecho propietario limitado bajo las leyes de Puerto Rico, si al amparo de la doctrina de inmunidad parlamentaria, según alegada por los demandados, el demandante pierde ese derecho (Traducción nuestra).[43]

---

[43] Las preguntas formuladas fueron las siguientes:

(1) Does the Ombudsman for Persons with Disabilities of Puerto Rico, because of his functions, enjoy limited property right to remain in his position for the duration of his fixed term subject to "just cause" as defined by law?
(2) Should "just cause" restrictions imposed on the Governor for removing Plaintiff from his position be

Inconformes con la determinación del Tribunal de Distrito de conceder el *injunction* preliminar, los demandados instaron una apelación interlocutoria ante el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito ("Tribunal de Apelaciones para el Primer Circuito"). En el recurso instado los demandados impugnaron la orden del foro primario federal en la que se concedió el *injunction* preliminar y se certificaron las preguntas ante la consideración de este Foro. No obstante a la presentación de una apelación ante el foro apelativo federal, certificamos las cuestiones presentadas por el Tribunal de Distrito.

Pendiente la certificación ante la consideración de este Tribunal, el 16 de abril de 2014 **el Tribunal de Apelaciones para el Primer Circuito revocó el *injunction* preliminar concedido por el Tribunal de Distrito.** El foro apelativo federal concluyó que erró el Tribunal de Distrito al ignorar un elemento esencial en la resolución de esta controversia: la eliminación del puesto del Procurador mediante la Ley Núm. 75. Ese foro apelativo descartó que en este caso la controversia se tratara sobre la destitución por el Gobernador de un funcionario ejecutivo que ejerce funciones cuasi legislativas o cuasi

---

considered an interference with Governor's ability to perform his constitutional duty and properly execute the duties of his office?
(3) What factors should the Court utilize when making such a determination?
(4) If there is limited property right under Puerto Rico law, does Plaintiff lose his right under the doctrine of legislative immunity as asserted by Defendants?

judiciales, sino más bien, como indicamos, de la eliminación de un puesto por virtud del válido ejercicio legislativo de promulgar o derogar leyes. Siendo ello así, dejó sin efecto el *injunction* preliminar emitido por entender que el demandante no estableció que tenía probabilidad de prevalecer en los méritos. El Tribunal de Apelaciones federal sostuvo que el puesto que ejercía el demandante fue abolido válidamente por la Asamblea Legislativa al aprobar la Ley Núm. 75 y el demandante no argumentó, ni demostró, que la Asamblea Legislativa no tenía el poder para abolir su posición. Sostuvo que, después de todo, "[r]epeal is an act unquestionably within the ken of the Puerto Rico Legislature and thus is fatal to Diaz's legal position". *Díaz Carrasquillo v. García-Padilla*, No. 13-2277, Slip Opinion, pág. 9 (1er Cir. 16 de abril de 2014) (citas omitidas). Además, el foro apelativo federal determinó que la abolición del puesto en controversia no violaba la Constitución del Estado Libre Asociado de Puerto Rico debido a que, a base de lo establecido por este Tribunal en *Gómez v. Negrón Fernández*, *supra*, el Procurador no tenía un derecho propietario sobre el puesto. Inconforme, el 30 de abril de 2014 el señor Díaz Carrasquillo presentó ante el Tribunal de Apelaciones para el Primer Circuito un Petition for Rehearing *en Banc*. El 9 de mayo de 2014 la petición fue denegada.

Así las cosas, el 8 de mayo de 2014 el señor Díaz Carrasquillo presentó ante este Tribunal una *Moción Urgente Solicitando Orden de Paralización en Auxilio de la Jurisdicción de este Tribunal*. Solicitó que emitiéramos una orden paralizando cualquier acto por parte del Gobernador para remover al señor Díaz Carrasquillo de su puesto como Procurador hasta que nos expresáramos en torno a las preguntas certificadas. Alegó que la decisión del Tribunal de Apelaciones para el Primer Circuito atentaba contra los principios básicos del federalismo al éste no abstenerse hasta que finalizara el procedimiento de certificación. Asimismo, entendió que el foro apelativo intermedio resolvió incorrectamente la controversia ante su consideración, por lo cual este Tribunal debía ejercer su jurisdicción exclusiva y atender las preguntas certificadas para evitar que el demandante sea removido del puesto en violación al derecho propietario que alega ostentar sobre el mismo.[44] Para todos los efectos prácticos, nos solicitó que revocáramos al Tribunal de Apelaciones para el Primer Circuito.

El 13 de mayo de 2014, la parte demandada presentó una urgente oposición a la moción presentada por la parte demandante y solicitó la anulación del auto de

---

[44] En esencia, argumentó que el foro apelativo federal erró al fundamentar su determinación en *Gómez v. Negrón Fernández*, ya que este caso fue decidido previo a la promulgación de la Constitución del Estado Libre Asociado. Por lo cual, el Tribunal debe hacer un análisis del derecho de propiedad que alega ostentar el demandante considerando los derechos concedidos por la Constitución y su jurisprudencia interpretativa.

certificación. Alegó que procedía denegar de plano la moción presentada por la parte demandante porque este Tribunal ostenta jurisdicción sólo sobre las preguntas certificadas y no sobre las partes ni sobre los méritos de la reclamación ante el foro federal. Por esto, indicó que el Tribunal no puede paralizar válidamente los efectos del dictamen del Tribunal de Apelaciones para el Primer Circuito, como tampoco procede revisar su determinación.

Por su parte, el Estado argumentó que si la parte demandante deseaba que el foro apelativo federal se abstuviera tenía que haberlo solicitado oportunamente, lo cual no hizo. Finalmente, los demandados solicitaron la anulación del auto de certificación al concluir que el Tribunal de Distrito partió de premisas equivocadas al certificar las preguntas ante este Tribunal. Esto, porque como bien determinó el foro apelativo federal, en este caso no medió la remoción de un funcionario público sino la abolición de su puesto como un ejercicio legítimo de la Asamblea Legislativa. Debido a lo anterior, sostiene que no se cumple con el requisito de que el asunto certificado sea determinante en el resultado del caso, puesto que ya el foro apelativo federal determinó que el demandante carece de un interés propietario sobre el puesto en controversia y no está ante este Tribunal una pregunta con respecto al poder de la Asamblea Legislativa de abolir puestos. Por tanto, de este Tribunal contestar las preguntas certificadas estaría emitiendo, en esencia, una

opinión consultiva. Posteriormente, ambas partes presentaron sus respectivas réplicas y dúplicas.

II

Como cuestión de umbral, debemos evaluar si las preguntas certificadas cumplen con los requisitos de justiciabilidad y de certificación interjurisdiccional.

A

La doctrina de la justiciabilidad gobierna el ejercicio válido del poder judicial. Esta doctrina "nace del principio elemental de que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen un interés real en obtener un remedio que haya de afectar sus relaciones jurídicas". *E.L.A. v. Aguayo*, 80 D.P.R. 552, 558-559 (1958). Mediante nuestros pronunciamientos en *E.L.A. v. Aguayo*, *supra*, adoptamos la normativa federal sobre la doctrina de justiciabilidad y señalamos que para el ejercicio válido del poder judicial se requiere la existencia de un "caso o controversia" real. Según hemos señalado, los límites del ejercicio del poder judicial, autoimpuestos mediante la doctrina de justiciabilidad, son necesarios porque constituyen "un mínimo de condiciones para el ejercicio discreto y tolerable de un poder que de otro modo constituiría una clara amenaza para la calidad democrática del sistema y convertiría a los jueces en guardianes de la comunidad". *E.L.A. v. Aguayo*, *supra*,

pág. 597. Al analizar los fundamentos adjudicativos del Juez Asociado Raúl Serrano Geyls en *E.L.A. v. Aguayo*, *supra*, el profesor Carlos E. Ramos González señala que:

> [La] visión [del Juez Serrano Geyls] sobre la naturaleza de los tribunales refleja un jurista preocupado por el rol de una rama judicial que opera bajo un sistema de separación de poderes. Al establecer estas premisas esenciales, la opinión allana el camino para declinar la invitación que le haría la rama ejecutiva para que la rama judicial facilite una fundamental obra de gobierno. Se trata en efecto de un cauteloso ejercicio del poder y una visión prudente sobre la naturaleza de los tribunales, asumida en un tiempo histórico donde las grandes mayorías simpatizaban con la posición que entonces asumía la rama ejecutiva.

Carlos E. Ramos González, *Derecho Constitucional: E.L.A. v. Aguayo o los albores de la independencia judicial puertorriqueña*, 34 Rev. Jur. U. Inter. P.R. 633,636 (2000).

Añade el profesor Ramos González que "en el contexto histórico en que se produce la opinión, el Tribunal de forma dialéctica sienta una base fundamental del derecho patrio en tanto reafirma decididamente la independencia judicial". *Id.* en la pág. 640. Por tanto, en aras de proteger el balance tripartito entre las ramas de gobierno – particularmente, el ejercicio del poder judicial para actuar como un consejo supremo de las determinaciones de otras ramas – decidimos autolimitar el alcance de nuestro poder judicial.[45] *Véase además Flast v.*

---

[45] Véase por ejemplo, *Note, The Validity of the Restrictions on the Modern Advisory Opinion*, 29 Maine L. Rev. 305, 310 (1978), en donde se señala que: "The separation of governmental powers insulates the judiciary from encroachment by the other branches of government, thereby placing responsibility on the Justices to apply the law according to their best judgment".

*Cohen*, 392 U.S. 83, 96-97(1968). Desde entonces, y pese a cuestionamientos legítimos sobre la sapiencia de nuestra determinación en *E.L.A. v. Aguayo*,[46] *supra*, hemos reiterado lo allí establecido. *Brau v. E.L.A de Puerto Rico*, 2014 TSPR 26, 189 D.P.R. ___ (2014); *Lozada Tirado et al. v. Testigos Jehová* , 177 D.P.R. 893, 907 (2010); Noriega v. Hernández Colón, 135 D.P.R. 406 (1994).

Así, como corolario de la doctrina de justiciabilidad, los tribunales estamos vedados de emitir opiniones consultivas. *Asoc. Alcaldes v. Contralor*, 176 D.P.R. 150 (2009); *Ortiz Rivera v. Panel sobre el FEI,* 155 D.P.R. 219 (2001); *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980). Hemos definido opinión consultiva "como la ponencia legal emitida por un tribunal cuando no tiene ante su consideración un caso o una controversia justiciable, y cuyo resultado, por lo tanto, no es obligatorio". *Asoc. Alcaldes, supra*, pág. 158. Así pues, la doctrina de opinión consultiva intenta evitar que se produzcan decisiones en el vacío, en el abstracto, o bajo hipótesis de índole especulativa, ya que no es función de los tribunales actuar como asesores o consejeros. *Id*. Esto es, una controversia no es justiciable cuando un tribunal debe pasar juicio sobre un asunto hipotético para

---

[46] Para una crítica a nuestra determinación en *E.L.A. v. Aguayo, supra*, véase José Julián Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales* 96-101 (2009); José Julián Álvarez González, *La protección de los derechos humanos en Puerto Rico*, 57 Rev. Jur. U.P.R. 133, 165-167 (1988).

beneficio de una o ambas partes en cuanto a una situación o conducta futura y especulativa. De lo contrario, actuaríamos como una tercera cámara o consejo supremo capaz de poner un veto final a las actuaciones de las ramas que encarnan la voluntad democrática de los ciudadanos. *Com. de la Mujer, supra*; *E.L.A. v. Aguayo*, *supra*.

B

Por su parte, en nuestro ordenamiento procesal civil el mecanismo de certificación interjurisdiccional está regulado por la Regla 25 del Reglamento de este Tribunal, 4 L.P.R.A. Ap. XXI-A, y el Art. 3002f de la Ley de la Judicatura de 2003, Ley Núm. 21 de 22 de Agosto de 2003 ("Ley de la Judicatura de 2003"), 4 L.P.R.A. sec. 24s(f). Este mecanismo permite que un tribunal federal pueda someter ante este Tribunal, para una contestación definitiva, cuestiones dudosas o noveles del Derecho puertorriqueño que **podrían determinar el resultado de un pleito ante el tribunal que solicita nuestra intervención.** *Pan Ame. Corp. V. Data Gen. Corp*, 112 D.P.R. 780, 783 (1982).

A su vez, permite "mitigar las tensiones inherentes a un sistema de justicia federalista". *Santana v. Gobernadora*, 165 D.P.R. 28, 42 (2005). De esta forma se pretende evitar la intromisión federal en la función legislativa del estado y los roces innecesarios entre ambas jurisdicciones, al tiempo en que se promueve el

cooperativismo judicial federal a través de un mecanismo sencillo y eficiente para las partes en litigio. Gerald M. Levin, *Inter-jurisdictional Certification: Beyond Abstention Toward Cooperative Judicial Federalism*, 111 U. Pa. L. Rev. 344, 350 (1963). Por tanto, bien utilizado, el mecanismo de certificación fortalece tanto el sistema judicial de los estados y del Estado Libre Asociado de Puerto Rico como el sistema judicial del gobierno federal.

Cabe señalar que, históricamente, se cuestionó la justiciabilidad de las preguntas certificadas mediante el mecanismo de certificación interjurisdiccional en aquellos estados en que estaban vedadas las opiniones consultivas.[47] *Véase* Comment, *Inter-Jurisdictional Certification and Full Faith and Credit in Federal Courts: To Certify or Not to Certify, Is that a Question?*, 45 Wash. L. Rev. 167 (1970). La preocupación principal era la posibilidad de atender una controversia mediante certificación sin que se cumpliese con el requisito de "caso o controversia". Algunas jurisdicciones optaron por reconocer las opiniones consultivas, otras aceptaron el mecanismo de certificación interjurisdiccional sujeto a que el mismo cumpliese con la doctrina de justiciabilidad. John B. Corr & Ira P. Robbins, *Interjurisdictional Certification and Choice of Law, 41 Vand. L. Rev.* 411, 419-422 (1988). En el caso de

---

[47] Este mecanismo es relativamente novel en la jurisprudencia federal pues fue adoptado para finales de la década del 50 del siglo XX. Hon. Bruce M. Selya, *Certified Madness: ask a silly question*, 29 Suffolk U.L. Rev. 677, 680-681(1995).

Puerto Rico, desde un inicio hemos establecido que las certificaciones interjurisdiccionales deben cumplir cabalmente con la doctrina de justiciabilidad. *Pan American*, *supra*, pág. 790. Es decir, "[l]a controversia jurídica que suscita la certificación tiene que originarse en un caso o controversia real entre las partes. De lo contrario, podría inducirse a una opinión consultiva que afecta la legitimidad y efectividad del dictamen adjudicativo". *H.E. Vicente Cuesnongle, O.P. v. D.A.C.O.*, 119 D.P.R. 457, 463-64 (1987) (Hernández Dentón, J., Op. Concurrente).

Por consiguiente, el mecanismo de certificación interjurisdiccional no altera nuestra responsabilidad de velar porque, al contestar las preguntas certificadas, no eludamos los criterios de autolimitación judicial propios de la doctrina de justiciabilidad adoptada por este Tribunal. Así, para que proceda una certificación interjurisdiccional hemos establecido una serie de requisitos para, por un lado, delimitar el alcance de nuestra intervención y, por otro, cumplir con la doctrina de justiciabilidad. Éstos son: (1) las preguntas certificadas deben involucrar cuestiones de Derecho puertorriqueño; (2) no deben existir precedentes claros que dispongan correctamente del asunto; (3) **las preguntas deben poder determinar el resultado del pleito ante el foro que certifica**; y (4) **la certificación debe contener una relación de los hechos relevantes a la controversia,**

**de forma tal que demuestren la verdadera naturaleza de la controversia**. *Guzmán v. Calderón*, 164 D.P.R. 220, 228 (2005); *Pan Ame. Corp., supra*, pág. 788.[48]

Los últimos dos requisitos, en particular, garantizan que para que una certificación interjurisdiccional sea atendida por este Foro, se cumpla con la doctrina de justiciabilidad. *Pan American*, *supra*, pág. 790. Por un lado, el tercer requisito exige que la determinación de este Tribunal pueda tener un efecto concreto en la controversia, y por otro, el cuarto requisito requiere que los hechos que se acompañan a la certificación demuestren la verdadera naturaleza de la controversia que amerita ser atendida por este Foro. En ausencia de un cumpliento cabal con estos requisitos, estamos impedidos de atender las cuestiones presentadas mediante una certificación interjurisdiccional.

C

Según la relación de hechos que el Tribunal de Distrito presentó en la solicitud de certificación y los fundamentos para emitir el *injunction* preliminar, la controversia en este caso se ciñe a determinar si el requisito de justa causa impuesto al Gobernador para la remoción del Procurador de las Personas con Impedimentos,

---

[48] Así vemos que si bien la Ley de la Judicatura de 2003 flexibilizó la normativa sobre las certificaciones interjurisdiccionales, aún permanece el requisito de que la decisión emitida por este Foro pueda determinar el resultado del pleito ante el foro federal. *Guzmán*, *supra*, pág. 229.

un funcionario ejecutivo que también ejerce funciones cuasi judiciales[49] y nombrado a un término de diez (10) años, incide sobre la facultad del Gobernador para cumplir y hacer cumplir las leyes. El foro federal de instancia, sorprendentemente, obvió un elemento o hecho fundamental e imprescindible al asunto planteado, a saber: la aprobación de la Ley Núm. 75 que derogó el cargo que el demandante ejercía. Ese hecho fundamental e imprescindible no pasó desapercibido para el Tribunal de Apelaciones para el Primer Circuito. Éste dejó sin efecto el *injunction* preliminar emitido por el foro primario federal, razonado, correctamente, que la verdadera controversia en este caso, **versaba sobre la eliminación del puesto de un funcionario ejecutivo mediante una legislación y no sobre la destitución de un funcionario que ejerce funciones cuasi legislativas y cuasi judiciales realizada por el Primer Mandatario.**

Luego de examinar con detenimiento los hechos de este caso según surgen de la solicitud de certificación del Tribunal de Distrito y los documentos que la acompañan, coincidimos con la apreciación del Tribunal de Apelaciones para el Primer Circuito: la controversia ante la consideración del Tribunal de Distrito versaba sobre la eliminación o abolición del puesto de un funcionario

---

[49] Según surge de la solicitud de certificación, el foro federal primario señaló que el señor Díaz Carrasquillo demostró que el cargo de Procurador para las Personas con Impedimentos ejerce funciones ejecutivas y cuasi judiciales.

ejecutivo mediante una legislación y no sobre la destitución de un funcionario ejecutivo que ejerce funciones cuasi judiciales. Consecuentemente, entendemos que las preguntas certificadas ante nuestra consideración, las cuales se fundamentan en la alegada destitución por el Primer Ejecutivo de un funcionario que ejerce funciones cuasi judiciales, no cumplen con los requisitos de una certificación interjurisdiccional. Por consiguiente, procede, luego de aplicar correctamente el Derecho, anular el recurso de certificación.

Es decir, un análisis sin ánimo prevenido de la solicitud de certificación y de los documentos que se acompañan a la misma nos lleva a concluir cuál es la verdadera naturaleza de la controversia en este caso, a saber: determinar si el señor Díaz Carrasquillo tenía algún derecho o interés propietario sobre su puesto, oponible a la facultad de la Asamblea Legislativa de crear, consolidar o reorganizar departamentos ejecutivos, en virtud de la Constitución del Estado Libre Asociado de Puerto Rico.

Como bien concluyó el Tribunal de Apelaciones para el Primer Circuito, basta analizar el tracto fáctico de este caso para concluir que la Asamblea Legislativa es la responsable de que, mediante su poder de legislación, se aboliera la Oficina del Procurador de las Personas con Impedimentos, entonces adscrita a la Oficina de Administración de las Procuradurías. Ello provocó que,

incidentalmente, se eliminara el puesto del señor Díaz Carrasquillo. Por tal razón, es irrelevante que nos pronunciemos sobre el interés propietario del señor Díaz Carrasquillo *vis à vis* los límites al poder del Gobernador para removerlo y los criterios que debe evaluar el Tribunal de Distrito para adjudicar esa diatriba constitucional, según sugieren las preguntas certificadas. Por tanto, para resolver este caso conforme a Derecho, no procede que ejerzamos nuestra jurisdicción para atender y contestar las preguntas certificadas por el foro federal, que no cumplen con el requisito de contener una relación de los hechos relevantes a la controversia, de forma tal que demuestre la verdadera naturaleza de la controversia.

De igual forma, tampoco procedía evaluar si un individuo pierde un derecho propietario limitado al entrar en conflicto con la doctrina de inmunidad parlamentaria. Esa cuestión presentada no es más que otro trampantojo jurídico. Cuando se alega que el Estado afecta un derecho o interés propietario la actuación estatal se evalúa al amparo de la cláusula de debido proceso de ley. En este caso la doctrina de inmunidad parlamentaria fue invocada por el Gobernador, no frente al supuesto de un interés o derecho propietario del demandante, sino ante el reclamo de la parte demandante de discrimen político. Tal reclamo fue presentado mediante una acción civil federal de privación de derechos al amparo de la sección 1983, 42 U.S. sec. 1983. Dentro de ese contexto, el Gobernador

argumentó que por razón de la inmunidad parlamentaria, extendida a éste por el acto legislativo de firmar y aprobar los estatutos en controversia, los foros judiciales estaban impedidos de entrar a considerar alegaciones sobre supuestas motivaciones discriminatorias por el acto de aprobar los estatutos.[50] Eso es un asunto que le compete al foro federal dirimirlo.[51] Por tal razón,

---

[50]De hecho, los casos citados por la opinión mayoritaria atienden la aplicabilidad de la inmunidad legislativa en situaciones donde se presentaron acciones por discrimen. Ningún caso citado evaluó un conflicto entre un derecho propietario de un ciudadano y la inmunidad legislativa, pues nuestro ordenamiento no admite dicho choque.

[51] En *Torres Rivera v. Calderón Serra*, 412 F.3d 205 (1er Cir. 2005), el Tribunal de Apelaciones para el Primer Circuito atendió una controversia similar a este asunto. Allí el foro apelativo intermedio federal tuvo ante sí una controversia originada por los siguientes hechos. El entonces Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Pedro Rosselló González, aprobó una legislación para restructurar la Comisión Industrial y aumentar el número de comisionados en la Comisión de cinco (5) comisionados a veinticinco (25). Estos serían nombrados por el Gobernador, con el consejo y consentimiento del Senado, por un término fijo. La legislación dispuso que los comisionados que en función al momento de la restructuración, continuarían ejerciendo el cargo hasta que venciera su término.

Eventualmente, la sucesora en la Gobernación, Hon. Sila M. Calderón, aprobó una legislación en la que se enmendó la legislación aprobada bajo la administración del Gobernador Rosselló González. Mediante esta legislación, se estableció una nueva estructura en la Comisión y se redujo el número de comisionados de veinticinco (25) comisionados a cinco (5). La legislación dispuso que los cinco (5) miembros serían nombrados por la Gobernadora. Nada se dijo sobre los comisionados que estaban en funciones al momento en que se aprobó la legislación. Posteriormente, el entonces Secretario de la Gobernación, Hon. Ferdinand Mercado, envió una carta a los (25) comisionados nombrados bajo la estructura anterior, en la que les notificó sobre la terminación de sus funciones en virtud de la legislación aprobada. Así las cosas, varios de los comisionados destituidos en virtud de la legislación presentaron una reclamación ante el Tribunal de Distrito en contra de la Gobernadora Sila M. Calderón y otros

emitir un juicio sobre esa cuestión no sólo falla en reconocer el verdadero asunto de derecho planteado, sino que se arriesga a discutir un asunto cuyo efecto, a lo sumo, es inocuo.

Por su parte, y consustancial a lo anterior, toda vez que las preguntas certificadas no atienden la verdadera controversia en este caso, la determinación de este Foro respecto a las cuestiones presentadas no será determinante para el resultado del pleito ante el foro federal. Es decir, cualquier determinación sobre las preguntas certificadas constituye la emisión de una opinión consultiva – o un extenso *dictum* – sobre cuestiones que, según analizamos, no son pertinentes ni determinantes para la resolución de esta controversia. Ya el Tribunal de Apelaciones para el Primer Circuito emitió una

---

funcionarios. Alegaron, entre otras cosas, que el estatuto era inconstitucional porque iba dirigido a removerlos mediando discrimen político en contra de éstos y violaba sus derechos a la libertad de expresión y a libertad de asociación por éstos estar afiliados del P.N.P.

Ante estos hechos, el foro apelativo intermedio federal confirmó la determinación del foro federal primario y concluyó, entre otras cosas, que el estatuto no era inconstitucional bajo el análisis de la Primera Enmienda de la Constitución federal. A su vez, desestimó la reclamación de discrimen en contra de la Gobernadora bajo la garantía de inmunidad parlamentaria extendida a la firma y aprobación de una legislación por el ejecutivo, y desestimó la reclamación en contra de los funcionarios ejecutivos bajo la doctrina federal de inmunidad condicionada. En lo pertinente, señaló que "there is no statutory invalidity from the fact that the statute may, in the end, lead to a situation in which the impact of the reorganization will be to disproportionally terminate the employment of members of one political party". *Torres Rivera*, 412 F.3d en la pág. 211.

determinación sobre la verdadera controversia ante la consideración del Tribunal de Distrito: el interés propietario de un funcionario ejecutivo cuando su puesto es abolido por la Asamblea Legislativa. A no ser que el interés de la mayoría sea revocar al Tribunal de Apelaciones de Estados Unidos para el Primer Circuito, facultad que le compete al Tribunal Supremo de Estados Unidos, sito en Washington D.C.

Reiteramos, el foro apelativo intermedio federal concluyó que dado a que el puesto del Procurador fue abolido por la Asamblea Legislativa al aprobarse la Ley Núm. 75, "Diaz had no property interest, i.e., no "right," in the Advocate position". *Díaz Carrasquillo v. García-Padilla*, No. 13-2277, Slip Opinion, págs. 9-10 (1er Cir. 16 de abril de 2014). Por tanto, cualquier determinación nuestra sobre las preguntas certificadas requeriría entrar a atender asuntos que fueron válidamente adjudicados por el Tribunal de Apelaciones para el Primer Circuito, foro con jurisdicción sobre las partes en esta controversia.[52]

---

[52] Como bien reconoce el Juez Asociado señor Martínez Torres en su Opinión de Conformidad, el foro apelativo intermedio federal no encontró una laguna doctrinal que incitara dudas sobre la interpretación correcta del derecho puertorriqueño aplicable. Al adjudicar la controversia ante su consideración el Tribunal de Apelaciones tácitamente reconoció la inmaterialidad de las preguntas certificadas por el Tribunal de Distrito.

Contrario a lo que sostiene el Juez Asociado, el Tribunal de Apelaciones para el Primer Circuito no estaba obligado a mostrar deferencia alguna a nuestra decisión de acoger la certificación. Si bien el Tribunal Supremo de Estados Unidos expresó en *Arizonans* que los tribunales federales deben evitar especular sobre el significado de un estatuto estatal cuando no ha sido interpretado por el

Por tal razón, en riesgo de emitir una opinión consultiva, procede que se anule el recurso de certificación interjurisdiccional ante nuestra consideración.

No obstante a lo anterior, hoy, una mayoría de este Tribunal, en claro incumplimiento con la doctrina de justiciabilidad y los requisitos de una certificación interjurisdiccional, se adentra a contestar las preguntas certificadas. Además, por razones exógenas al Derecho, una

máximo foro estatal y está disponible el mecanismo de certificación, ese foro fundamentó su conclusión en que la controversia bajo el derecho estatal evitaría una adjudicación innecesaria bajo la constitución federal. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 73 (1997). Ése es el verdadero ámbito de la llamada abstención *Pullman*: cuando en circunstancias especiales surge una incertidumbre sustancial sobre la interpretación del derecho estatal y existe una probabilidad razonable de que aclarar esa interpretación evitaría una adjudicación al amparo de la constitución federal, un tribunal federal debe abstenerse de adjudicar la controversia hasta cuanto termine de litigarse el caso en el foro estatal. Chemerinsky, p.818, sec. 12.2.

No procede invocar la doctrina de abstención *Pullman* meramente porque el foro estatal no ha considerado la constitucionalidad del estatuto impugnado al amparo de su constitución. Chemerinsky, en la pág. 820. La ausencia de una interpretación por un foro estatal no es, de por sí sola, suficiente para causar duda sobre la interpretación adecuada Id. Tampoco procede invocar la abstención *Pullman* cuando la disposición constitucional estatal contiene disposiciones análogas a la constitución federal, como resulta evidente en la controversia ante nosotros, o para meramente otorgarle al tribunal estatal la oportunidad de decidir la controversia antes que el foro federal. Chemerinsky, pág. 821 citando a *Wisconsin v. Constantineau*, 400 U.S. 433,439 (1971) y *Zickler v. Koota*, 389 U.S. 241, 251 (1967). En este caso ni siquiera existía una incertidumbre, mucho menos sustancial, pues el Tribunal de Apelaciones para el Primer Circuito contaba con el precedente de *Gómez*, *supra*, que atiende a cabalidad la controversia que estuvo ante su consideración. De hecho, irónicamente, en la opinión consultiva que hoy emite la mayoría se reafirma mediante malabarismos judiciales la norma allí establecida.

mayoría de este Tribunal cede ante la petición de la parte demandante y se expresa sobre asuntos que no están ante nuestra consideración pero que tienen graves repercusiones en el ámbito político. Ello, en la medida de que intenta pasar juicio sobre cierta legislación pendiente ante la consideración de la Asamblea Legislativa. En otras palabras, la opinión consultiva que hoy se emite opera como una censura previa que pretende impedir que la Asamblea Legislativa legisle.

Es lamentable que en casos como éste, en que se discuten asuntos de política pública de una administración en particular, una mayoría esté dispuesta a abdicar toda noción básica sobre autolimitación judicial y sobre los principios de un sistema judicial federalista. Parecería ser que con el tiempo retrocedemos de aquel momento en que velábamos por el cauteloso ejercicio del poder judicial y de nuestra visión prudente sobre la naturaleza de los tribunales, momentos que, en palabras del profesor Ramos González, configuraron los albores de la independencia judicial. Carlos E. Ramos González, *Derecho Constitucional: E.L.A. v. Aguayo o los albores de la independencia judicial puertorriqueña*, 34 Rev. Jur. U. Inter. P.R. 633, 636 (2000). En días como éstos me pregunto: ¿qué queda de ella?

Dado a que una mayoría de este Tribunal adelanta, mediante la opinión consultiva que hoy se emite, el criterio sobre el interés propietario de un funcionario

ejecutivo cuyo puesto fue abolido mediante legislación por la Asamblea Legislativa, nos vemos obligados a disentir de su apreciación "en los méritos".

III

A

La Constitución establece que ninguna persona puede ser privada de su propiedad sin un debido proceso de ley. Const. PR, Art. II sec. 7. Este derecho tiene su contraparte en las Enmiendas V y XIV de la Constitución de los Estados Unidos. Const. EE. UU. Enmd. V y XIV. El debido proceso de ley se manifiesta en dos modalidades: la modalidad sustantiva y la modalidad procesal. En la modalidad sustantiva, el debido proceso de ley impide que el Estado, al aprobar leyes o al realizar una actuación, afecte de manera irrazonable, arbitraria o caprichosa los intereses de propiedad o libertad. *Rivera Santiago v. Srio. de Hacienda*, 119 D.P.R. 265 (1987); *Rivera Rodríguez v. Lee Stowell*, 133 D.P.R. 881 (1993). Por su parte, bajo la modalidad procesal, el Estado tiene la obligación constitucional de garantizar que al interferir con un interés libertario o propietario de una persona se cumpla con un procedimiento justo y equitativo. *González Aristud v. Hosp. Pavía*, 168 D.P.R. 127 (2006). En otras palabras, para privar a una persona de su libertad o propiedad, el Estado tiene que garantizar un proceso justo y equitativo que tome en consideración el interés propietario o libertario de la persona afectada por su actuación.

Ahora bien, para que se active la protección constitucional a un debido proceso de ley en su modalidad procesal, es necesario que exista un interés individual de libertad o propiedad que amerite la referida protección constitucional. *Vázquez González v. Mun. de San Juan*, 178 D.P.R. 636 (2010); *Rivera Santiago v. Srio. de Hacienda*, 119 D.P.R. 265 (1987). Es decir, "tiene que estar en juego un interés individual de libertad o propiedad". *Rivera Rodríguez & Co. v. Lee Stowell, etc.*, 133 D.P.R. 881, 888 (1993).

A tales efectos, el Tribunal Supremo de Estados Unidos ha señalado que los intereses propietarios "are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits". *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Determinada la existencia de un interés propietario o libertario, se activa la protección constitucional de la cláusula de debido proceso de ley de nuestra Constitución y de la Constitución de Estados Unidos, y procede entonces determinar cuál es el procedimiento exigido. *Torres Solano v. P.R.T.C.*, 127 D.P.R. 499, 529 (1990).

En ocasiones anteriores hemos reconocido que los empleados públicos de carrera tienen un interés en la

retención de su empleo si dicho interés está protegido por ley o cuando por razón de las circunstancias se crea una expectativa de continuidad en el empleo. *Orta v. Padilla Ayala*, 131 D.P.R. 227 (1992); *Pierson Muller I v. Feijoo*, 106 D.P.R. 838 (1978). Igualmente, hemos señalado que empleados del gobierno que no gozaban de un puesto de carrera también tienen un interés propietario sobre el mismo.[53]

No obstante, ninguno de estos casos se enfrentaba al supuesto de que la Asamblea Legislativa, mediante legislación, hubiese abolido una oficina o departamento ejecutivo e incidentalmente se hubiese eliminado el cargo de un funcionario público. Tal análisis merece una discusión particular sobre las facultades y poderes de la Asamblea Legislativa para abolir una agencia o departamento ejecutivo como corolario de "la facultad para crear, consolidar o reorganizar departamentos ejecutivos y definir sus funciones". Const. P.R. Art. III sec. 16. A saber, ¿qué interés propietario, si alguno, posee un funcionario sobre un puesto creado por una ley que fue

---

[53] Por ejemplo, hemos reconocido el interés propietario de una empleada escolar sobre la expectativa, en virtud de un contrato implícito, de que el puesto transitorio en que se desempeñaba se convirtiese en permanente. *Lupiáñez v. Srio. de Instrucción*, 105 D.P.R. 696 (1977). A su vez, hemos reconocido el interés propietario de un Alcalde sobre el sueldo, los beneficios marginales y el ejercicio del cargo para el cual fue electo, al haber sido suspendido de su cargo por el Gobernador cuando todavía quedaba pendiente la formulación de cargos en su contra. *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716 (1982).

derogada por la Asamblea Legislativa en el ejercicio de sus facultades? Veamos.

B

Como parte del interés de nuestros constituyentes de establecer un sistema de pesos y contrapesos que garantice el equilibrio de poder entre nuestras tres ramas de gobierno, la sección 16 del Artículo III de la Constitución de Puerto Rico dispone que la Asamblea Legislativa tendrá la facultad de crear, consolidar o reorganizar departamentos ejecutivos y definir sus funciones. Const. P.R. Art. III, Sec. 16. Según hemos señalado en el pasado, con esta sección nuestros constituyentes quisieron "incorporar en nuestra jurisdicción [] criterios similares a los adoptados en la jurisdicción federal en cuanto al alcance del poder de la Asamblea Legislativa para intervenir. . .con los poderes delegados a la Rama Ejecutiva". *Guzmán v. Calderón*, 164 D.P.R. 220, 233 (2005).

Desde muy temprano en la jurisprudencia federal, el Tribunal Supremo de Estados Unidos reconoció que consustancial a la facultad del Congreso de crear agencias ejecutivas, está el poder para abolirlas o modificarlas. *Butler v. Pennsylvania*, 51 U.S. (10 How.) 511 (1850). Posteriormente, fundamentándose en la determinación en *Butler*, el Tribunal Supremo federal señaló que "the legislative power of a State, except so far as restrained by its own Constitution, is at all times absolute with

respect to all offices within its reach. It may at pleasure create or abolish them, or modify their duties". *Higginbotham v. City of Baton Rouge, La.*, 306 U.S. 535, 538 (1939); *Newton v. Commissioners*, 100 U.S. 548, 559 (1879).

En *Newton v. Commissioners*, 100 U.S. 548 (1879), el Tribunal Supremo de Estados Unidos aclaró que tal poder legislativo responde al principio de que:

> Every succeeding legislature possesses the same jurisdiction and power with respect to them as its predecessors. The latter have the same power of repeal and modification which the former had of enactment, neither more nor less. All occupy, in this respect, a footing of perfect equality. This must necessarily be so in the nature of things. It is vital to the public welfare that each one should be able at all times to do whatever the varying circumstances and present exigencies touching the subject involved may require.

*Id.* en la pág. 559.

A tales efectos, en *Lewis v. United States*, 244 U.S. 144 (1917), el Tribunal Supremo de Estados Unidos sostuvo que una legislación que abolía una ley en virtud de la cual se creaba un cargo público, tenía el efecto incidental de abolir el cargo público. Por tal razón, a partir de la fecha en que el cargo quedó abolido, el funcionario que ocupaba el cargo no tenía derecho a permanecer en el puesto ni a los beneficios que se derivaban de él. *Id.* Este razonamiento jurídico fue reafirmado en *Higginbotham v. City of Baton Rouge*, *supra*. En *Higginbotham* el Tribunal Supremo de Estados Unidos sostuvo que la Asamblea Legislativa tenía el poder para

abolir o modificar las agencias ejecutivas y modificar los términos, deberes y funciones de sus funcionarios. Por tal razón, denegó la reclamación presentada por el señor Higginbotham sobre su cargo, cargo que tenía un término que no había concluido.

En el caso de Puerto Rico, el único límite plasmado en nuestra Constitución a tal facultad legislativa se refiere a aquellos departamentos ejecutivos creados en virtud de en virtud de la propia Constitución. Const. Art. IV sec. 6. Por consiguiente, fuera de los departamentos ejecutivos establecidos por mandato constitucional, la Asamblea Legislativa tiene plena facultad "para crear, reorganizar y consolidar departamentos ejecutivos de gobierno, y para definir sus funciones". Const. Art. IV sec. 6. Facultad que conlleva necesariamente el poder para abolir los departamentos ejecutivos creados. *Butler v. Pennsylvania*, *supra*.

Sin embargo, en reconocimiento del poder de nombramiento del ejecutivo y del balance de poderes entre las ramas de gobierno, hemos señalado que la Asamblea Legislativa, en el ejercicio de su facultad de legislar sobre los departamentos ejecutivos, no puede afectar irrestrictamente el poder del gobernador de nombramiento y, consustancial a este poder, el poder de destitución. *Santana*, *supra*, pág. 74. Por tal razón, tanto en *Guzmán* como en *Santana*, evaluamos las restricciones impuestas por la Asamblea Legislativa al poder de destitución del

Gobernador sobre funcionarios ejecutivos y adoptamos la jurisprudencia federal sobre tales casos.

**Distinto es, sin embargo, aquellas instancias en que, tal y como reseñamos en la esfera federal, la Asamblea Legislativa opta por eliminar o abolir un departamento, agencia o instrumentalidad del Ejecutivo e incidentalmente elimina un cargo público.** Esta controversia **fue atendida y resuelta por este Tribunal en *Gómez v. Negrón Fernández*, 65 D.P.R. 305 (1945).** En *Gómez*, *supra*, citando con aprobación la jurisprudencia federal antes reseñada,[54] sostuvimos que:

> Está firmemente establecido. . . que al abolir un cargo creado por la Legislatura no se priva al incumbente de ningún derecho constitucional. No existe ningún derecho contractual o interés de propiedad en relación con la aceptación de un cargo de creación legislativa y el incumbente lo acepta bajo el entendido de que el mismo puede ser abolido en cualquier momento.

*Gómez*, *supra*, pág. 312.

Según surge de los hechos del caso de Gómez, el señor Gómez fue nombrado por el Gobernador con el consentimiento del Senado para ocupar el cargo de Fiscal del Tribunal Supremo por cuatro años, en virtud de la Ley Núm. 39 de 7 de marzo de 1912 ("Ley Núm. 39"), 3 L.P.R.A. sec. 84-85i (derogada). Posteriormente, la Ley Núm. 39 fue enmendada por la Asamblea Legislativa mediante la aprobación de la Ley Núm. 270 de 14 de mayo de 1945, 3 L.P.R.A. sec. 85

---

[54] En específico, hicimos referencia a la trilogía de casos *Higginbotham v. Baton Rouge*, 306 U.S. 535, 538 (1939) *Newton v. Commissioners*, 100 U. S. 548, 559, *Butler v. Pennsylvania*, 51 U.S. (10 How.) 511 (1850).

(derogada). Esta última legislación creó el cargo de Procurador General Auxiliar y Fiscal del Tribunal Supremo. Así las cosas, el Procurador General optó por no nombrar al señor Gómez para ocupar la plaza recién creada. Adujo que por considerar que el puesto de Gómez había sido abolido por la Ley Núm. 270, tenía la facultad de nombrar a la persona de su predilección al puesto recién creado. En desacuerdo, el señor Gómez presentó un recurso de *mandamus* para que se ordenara su reinstalación en el puesto. Alegó que la Asamblea Legislativa se limitó a realizar una leve alteración en la designación oficial, pero que el puesto tenía las mismas obligaciones, atribuciones y deberes del puesto abolido.

No obstante, contrario a la alegación del señor Gómez, señalamos que "cuando exista la más leve diferencia entre dos cargos, no por su designación oficial, sino **en cuanto a su naturaleza,** no puede sostenerse que el cargo anterior no ha sido abolido". *Id.* en la pág. 311. A tales fines, reconocimos que la Legislatura puede establecer un nuevo sistema de gobierno para las instituciones o departamentos creados en virtud de un plan anterior y "abolir el plan y los cargos creados para la administración de ese plan, en su totalidad o en parte". *Id*. en la pág. 313. Finalmente, señalamos que "[e]n cuanto a la sabiduría, conveniencia o motivos que haya tenido la Legislatura para actuar en la forma en que lo ha hecho, **no concierne a la rama judicial, dentro de nuestro**

**sistema de separación de poderes, entrar a investigarlos o discutirlos**". *Id.* en la pág. 314. Por consiguiente, podemos colegir que en *Gómez*, *supra*, este Tribunal estableció un criterio objetivo para evaluar si, en efecto, las actuaciones de la Asamblea Legislativa iban dirigidas únicamente a remover al incumbente, a saber, el criterio de análisis exige que la naturaleza del cargo varíe mediante la promulgación de una ley que elimine el departamento ejecutivo e incidentalmente el cargo anterior.[55]

A tenor con la normativa antes reseñada, no albergamos duda de que la facultad de la Asamblea Legislativa para abolir o reorganizar un departamento e incidentalmente abolir un cargo está contemplada en el poder legislativo para crear, consolidar o reorganizar departamentos ejecutivos y definir sus funciones. En el caso de una legislación que tenga como propósito eliminar una oficina y crear una nueva, lo que procede es evaluar si se le conceden nuevas facultades y deberes a la oficina de nueva creación en comparación con la anterior. En caso de que así se haya hecho, un funcionario público no puede

---

[55] La adopción de estos parámetros no fue novel para un tribunal estatal de más alta jerarquía, pues un repaso histórico da cuenta de que estos parámetros fueron adoptados con anterioridad a nuestra determinación por tribunales de más alta jerarquía en distintos estados de Estados Unidos al analizar casos en que, mediante legislación, la Asamblea Legislativa abolía una oficina e, incidentalmente, eliminaba un cargo público. *Véanse State ex rel. Hammond v. Maxfield*, 132 P.2d 660 (Utah, 1942) *O'Connor v. Greene*, 21 N.Y.S.2d 631 (New York, 1940).

albergar un interés propietario sobre un cargo que ha sido abolido o eliminado por disposición estatutaria. Por su parte, una vez la Asamblea Legislativa aprueba la abolición, eliminación o reorganización de un departamento ejecutivo, conforme a la facultad conferida por nuestra Constitución, compete al poder ejecutivo aprobar o vetar la legislación y de aprobarla, actuar conforme al mandato legislativo.

IV

En esta controversia, la Asamblea Legislativa, en virtud de su facultad de abolir o reorganizar departamentos, optó por derogar el Plan de Reorganización mediante la aprobación de la Ley Núm. 75. Lo cual, para todos los efectos prácticos, abolió las Procuradurías creadas en virtud del Plan de Reorganización, entre éstas, la Oficina del Procurador de la Personas con Impedimentos, y la Oficina para la Administración de las Procuradurías ("OAP"). Esto provocó que incidentalmente se eliminara el cargo del señor Díaz Carrasquillo y de los demás procuradores nombrados en virtud del Plan de Reorganización. Coetáneamente, la Asamblea Legislativa aprobó la Ley Núm. 78 en virtud de la cual "[s]e **crea** la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico". Artículo 2 de la Ley Núm. 78 de 24 de julio de 2013. Tanto en la Ley Núm. 75 como en la Ley Núm. 78, se dispuso que entrarían en vigor en un término de treinta (30) días después de su

aprobación, término que se utilizaría para hacer la transición entre la OAP y las Procuradurías de recién creación.

A tales fines, y en cumplimiento con el mandato legislativo, el Gobernador nombró un Comité de Transición y, eventualmente, nominó a un Procurador interino a la Oficina de la Procuraduría para las Personas con Impedimentos. No queda duda entonces de que el rol de un tribunal de Derecho en esta controversia (y no la transmutada por la mayoría) se limitaba a determinar si la actuación legislativa cumple con los parámetros establecidos en la jurisprudencia federal y la puertorriqueña sobre el poder de la Asamblea Legislativa para abolir o reorganizar un departamento ejecutivo. En específico, a evaluar si en el ejercicio de tal facultad, la actuación legislativa no estaba dirigida a remover al señor Díaz Carrasquillo conforme a los criterios objetivos establecidos en *Gómez v. Negrón Fernández*, 65 D.P.R. 286 (1945). Procede que, para efectos de la discusión de este caso en "los méritos", evaluemos los deberes y facultades de la extinta Oficina del Procurador de las Personas en comparación con los de la Oficina recién creada.

Según mencionamos, conforme al Plan de Reorganización se creó la Oficina de Administración de las Procuradurías ("OAP"), organismo bajo el cual se consolidaron todas las facultades, funciones y deberes administrativos de las procuradurías. Con la creación de la OAP, el Plan

pretendía que los procuradores se enfocaran más en los asuntos que afectaban a la población que representaban y no en gestiones de índole administrativo. A tales efectos, se dispuso que con la consolidación de las funciones administrativas de las Procuradurías bajo el mando de la OAP "se persigue la integración de los servicios de las oficinas destinadas a las finanzas, recursos humanos, compras, tecnología de informática, radicación de querellas, trámites y notificaciones y otras que rinden servicios similares en cada Procuraduría". 3 L.P.R.A. Ap. XVII, Art. 2 (derogado).

Es decir, la nueva Oficina del Procurador de las Personas con Impedimentos, creada por el Plan de Reorganización, eliminó poderes y deberes del Procurador al tiempo en que sometió a las distintas Oficinas, entre éstas, la Oficina del Procurador de las Personas con Impedimentos, a la supervisión de la OAP. A tales fines, limitó las facultades de las Oficina del Procurador de las Personas con Impedimentos esencialmente a:

> [A]tender e investigar los reclamos de las personas con impedimentos en las áreas de la educación, la salud, el empleo y la libre iniciativa empresarial o comercial de los derechos civiles y políticos, de la legislación social, laboral y contributivo, de la vivienda, la transportación, la recreación, la protección del medio ambiente y la cultura, entre otras.

3 L.P.R.A. Ap. XVII, Art. 2 (derogado).

A manera de ilustración, el Plan de Reorganización de 2011 creaba el puesto de Administrador de las Procuradurías y éste, entre otras cosas, estaba encargado

de gestionar y recibir el presupuesto, tanto de su oficina, la OAP, como de las procuradurías;[56] debía establecer un programa a través del cual la población que atendía cada Procuraduría podía canalizar sus quejas para luego referirlas a los procuradores;[57] y tenía la función de planificar, organizar y dirigir los asuntos y transacciones relacionadas al manejo y gobierno interno de la OAP y de las Procuradurías. Específicamente, se le encargaron "todos los asuntos y operaciones relacionadas con los recursos humanos, contratación de servicios, asignación presupuestaria, adquisición, uso y control de equipo, medios de comunicación y tecnología, prensa,

---

[56] Art. 6- Funciones y Facultades del Administrador. . . .
(d) gestionar, recibir, formular, ejecutar el control del presupuesto y garantizar que los fondos provenientes de asignaciones legislativas, federales o estatales, y de transferencias, delegaciones, aportaciones y donativos que se reciban para la operación de la OAP y de las Procuradurías sean utilizados, conforme a sus propósitos y a las delegaciones hechas en este Plan. Los fondos disponibles serán evaluados y contabilizados conforme a la estructura programática aprobada, cuya ejecución tendrá medidas de control, establecidos por la OAP y sujeto a las leyes que regulan el uso de fondos públicos, normas o reglas en virtud de los cuales los reciba la OAP o las Procuradurías, según los reglamentos que el Administrador adopte para esos fines.

[57] Art. 6- Funciones y Facultades del Administrador. . . .
(i)establecer como parte de su estructura, un área o programa a través del cual la población que atiende cada Procuraduría, pueda canalizar sus quejas o reclamos en caso de violación de derechos, inacción de las agencias o de servir de enlace entre éstos y la agencia concernida.

materiales y propiedad, reproducción de documentos y otros materiales".[58] 3 L.P.R.A. Ap. XVII, Art. 6 (derogado).

En vista de que la Ley Núm. 75 eliminó la OAP, los deberes previamente mencionados recayeron en cada una de las procuradurías creadas posteriormente, entre las cuales se encuentra la Oficina del Procurador de las Personas con Impedimentos creada por la Ley Núm. 78. Como resultado, a la nueva oficina se le otorgaron mayores deberes que a la derogada, como por ejemplo, el manejo de las querellas presentadas, del presupuesto y del reclutamiento necesario para llevar a cabo los propósitos de la Ley Núm. 78, sin la colaboración de una oficina administrativa que se encargue de ello como lo hacía la OAP.

A su vez, en virtud de la nueva Ley, el Procurador tiene el deber de "[d]eterminar la organización interna de la oficina y establecer los sistemas que sean menester para su adecuado funcionamiento y operación, así como llevar a cabo las acciones administrativas y gerenciales necesarias para la implantación de esta Ley", sin la colaboración que la OAP le brindaba bajo el Plan de Reorganización derogado. Artículo 9 (a) de la Ley Núm. 78 de 24 de julio de 2013. En reconocimiento de los nuevos

---

[58] Art. 6- Funciones y Facultades del Administrador.
(a) planificar, organizar y dirigir todos los asuntos y operaciones relacionadas con los recursos humanos, contratación de servicios, asignación presupuestaria, adquisición, uso y control de equipo, medios de comunicación y tecnología, prensa, materiales y propiedad, reproducción de documentos y otros materiales; y demás asuntos y transacciones relacionadas al manejo y gobierno interno de la OAP y de las Procuradurías.

deberes del Procurador bajo la Ley Núm. 78, la Asamblea Legislativa le otorgó a éste expresamente la facultad de nombrar un Procurador Auxiliar para delegarle cualquiera de las funciones dispuestas en la ley. [59]

A base de lo anterior, queda meridianamente claro que la Ley Núm. 78 tuvo como propósito crear una nueva Oficina del Procurador de las Personas con Impedimentos, tal y como la ley dispone expresamente.[60] Además, existe más que una leve diferencia entre las dos oficinas. La Oficina pasó de ser una entidad encargada de la fiscalización, a una encargada de la fiscalización, el manejo y la administración de toda la estructura de la nueva procuraduría así como de los empleados y funcionarios a su cargo. Después de todo, esto fue lo que provocó que en un principio se aprobara el Plan de Reorganización de 2011, a saber, eliminar facultades a los procuradores para que estos se encargaran únicamente del ejercicio fiscalizador de la agencia. De ahí que el legislador, bajo el Plan de

---

[59] Art. 5- Nombramiento del Procurador de las Personas con Impedimentos y del Procurador Auxiliar.
. . . . .
 (b) El Procurador podrá nombrar un Procurador Auxiliar y delegarle cualquiera de las funciones dispuestas en esta Ley…
[60] Artículo 2- Creación de la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico.
Se crea la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico.
. . . . .
Artículo 4- Creación de la Oficina del Procurador de las Personas con Impedimentos.
Se crea la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico como una entidad jurídica independiente y separada de cualquier otra agencia.

Reorganización de 2011, optara por crear una oficina encargada de las facultades administrativas. Por el contrario, la Asamblea Legislativa actual quiso cambiar nuevamente la estructura operacional de las procuradurías y para ello creó un andamiaje administrativo similar al existente previo a la aprobación del Plan de Reorganización de 2011.

Por tanto, si estableciéramos que tanto bajo el Plan de Reorganización de 2011 como bajo las Leyes Núm. 75 y Núm. 78 **no** hubo un cambio significativo en las facultades y funciones de los procuradores, negaríamos precisamente la esencia misma por la cual fueron impulsadas estas propuestas legislativas. En ambos proyectos lo que se pretendía cambiar, y lo que efectivamente se cambió, eran las facultades de los procuradores —aunque por fundamentos distintos y con un resultado distinto— y como consecuencia, el funcionamiento, operación y administración de la oficina.

A tales fines, la Asamblea Legislativa actual optó por crear una nueva estructura organizacional en la Oficina del Procurador de las Personas con Impedimentos y, en tal encomienda, cambió la naturaleza y facultades de la oficina derogada. La actuación legislativa no iba dirigida a remover al señor Díaz Carrasquillo de su cargo, sino a establecer la nueva política pública y andamiaje de las procuradurías. Si bien uno de los efectos incidentales de esta actuación legislativa fue la

eliminación del cargo que ocupaba el señor Díaz Carrasquillo, ello se hizo conforme a los parámetros establecidos en *Gómez*, *supra*. Es decir, la Asamblea Legislativa varió sustancialmente la naturaleza del cargo que ocupaba el señor Díaz Carrasquillo mediante la creación del nuevo cargo. No compete a este foro evaluar la sapiencia de este acto legislativo investido por disposición constitucional en la Asamblea Legislativa. De lo contrario, atentaríamos contra la separación de poderes, piedra angular de nuestra estructura constitucional.

A tenor con anterior, y conforme a lo resuelto en *Gómez*, *supra*, entendemos que las Leyes Núm. 75 y Núm. 78 abolieron la Oficina del Procurador de las Personas con Impedimentos creada por el Plan de Reorganización de 2011, lo cual ocasionó que incidentalmente se eliminara el cargo que ostentaba el señor Díaz Carrasquillo y se creara una Oficina con facultades adicionales a las que tenía el entonces Procurador. Mediante la concesión de facultades adicionales, la Asamblea Legislativa cambió la naturaleza y facultades de la Oficina del Procurador de las Personas con Impedimentos. Por tal razón, la promulgación de las Leyes Núm. 75 y Ley Núm. 78 fue un acto válido conforme a los poderes conferidos por nuestra Constitución a la Asamblea Legislativa. Ante la eliminación válida de su cargo por la Asamblea Legislativa, el señor Díaz Carrasquillo no tenía un derecho o interés propietario

sobre el cargo. Tal consecuencia es incidental a nuestro sistema democrático de derecho y al poder constitucional que le fue conferido a la Asamblea Legislativa.

Hoy la mayoría, luego de discutir en detalle cada una de las preguntas certificadas, procede a discutir el interés propietario de un funcionario ejecutivo cuyo puesto fue incidentalmente eliminado mediante una legislación que abolió la ley que creaba su puesto. Tal discusión merece dos señalamientos. Primero, resulta paradojal que la mayoría proceda a discutir las preguntas certificadas y que, además, atienda la controversia sobre el interés propietario de un funcionario cuyo puesto fue eliminado. De haber entendido que efectivamente la controversia ante nuestra consideración versaba sobre las relación de hechos certificada – a saber, la destitución de un funcionario ejecutivo que ejerce funciones cuasi judiciales – resulta innecesaria toda discusión sobre el interés propietario de un funcionario cuyo puesto fue eliminado por la Asamblea Legislativa. Por el contrario, de haber entendido que la controversia no versaba sobre el asunto certificado, procedía denegar o anular la certificación jurisdiccional. No obstante, la mayoría se adentra a discutir ambas controversias sin aparente comprensión sobre lo anterior o, al menos, un intento por conciliar ambas discusiones.

Segundo, la mayoría reafirma la vigencia y aplicación de *Gómez*, *supra*, en nuestro ordenamiento. Es

decir, la mayoría reconoce que la vigencia de este precedente nunca ha estado en controversia. Sin embargo, mediante una ininteligible y escueta argumentación jurídica pretende alterar su aplicación a la controversia resuelta por el Tribunal de Apelaciones para el Primer Circuito. Ello denota, según hemos señalado, un claro desdén hacia las normas básicas de autolimitación judicial y los principios del federalismo.

Según hemos fundamentado en derecho, el señor Díaz Carrasquillo no tiene un derecho o interés propietario sobre el cargo, el cual fue abolido válidamente por la Asamblea Legislativa. Por todo lo anterior, anularía la certificación interjurisdiccional expedida. Por los fundamentos expresados, disiento del curso de acción trazado por la mayoría.


Anabelle Rodríguez Rodríguez
JuezAsociada